**Gregory WILSON, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 88–SC–896–MR.

Supreme Court of Kentucky.

June 4, 1992.

Rehearing Denied Oct. 22, 1992.

David Bruck, Chief Atty., South Carolina Office of Appellate Defense, Columbia, S.C., Mario Gerald Conte, Jr., San Diego, Cal., Robert W. Carran, Covington, for appellant.

Chris Gorman, Atty. Gen., David A. Smith, Asst. Atty. Gen., Elizabeth A. Myerscough, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

Mary Broderick, Director, Defender Div., Nat. Legal Aid & Defender Ass'n, Washington, D.C., Margery B. Koosed, Professor of Law, University of Akron School of Law, Akron, Ohio, Russell J. Baldani, Baldani, Rowland & Richardson, Lexington, for amicus curiae Nat. Legal Aid and Defender Ass'n.

WINTERSHEIMER, Justice.

Gregory Wilson appeals from a judgment based on a jury verdict which convicted him of murder, kidnapping, first-degree rape, first-degree robbery and criminal conspiracy to commit robbery. He was sentenced to death on the murder and kidnapping convictions and to consecutive prison terms of 20, 20 and 10 years respectively for first-degree rape, first-degree robbery and criminal conspiracy to commit robbery.

The victim was a restaurant employee in Newport. On Friday, May 29, 1987 at 11:45 p.m., she left her best friend's house and said she was going straight home. The prosecution presented evidence that she had just parked her car outside of her apartment in Covington when she was abducted by Wilson and co-defendant Humphrey at knife point.

Testimony at trial from various sources, including Humphrey, indicated that the victim was forced into the back seat of her own car. Humphrey drove the car to the flood wall in Covington. Wilson took the victim out of the car and took her up on the flood wall and made her lie down with her eyes closed while Humphrey went to put gas in the car. After Humphrey returned from the gas station, Wilson again forced the victim into the back seat of the car.

Wilson made the victim unbutton her blouse. Wilson finished undressing the victim and raped her. He then tied her hands with a lamp cord, and the victim began begging for her life. Wilson told her she would have to die. Humphrey said, "You have seen us. You know who we are, and you have to die." The victim kept begging, "Please don't kill me. I don't want to die." Wilson robbed her and strangled her to death before they crossed the state line into Indiana.

Wilson and Humphrey disposed of the victim's naked corpse in a wooded thicket in rural Hendrix County, Indiana. Later that same morning, Saturday, May 30, Wilson and Humphrey stopped at a Holiday Inn in Crawfordsville, Indiana. According to a registration card, Humphrey and a guest checked into the hotel at 4:19 a.m. Two of the maids there identified the pair as Wilson and Humphrey.

Wilson and Humphrey proceeded to a Payless Shoe Store in Danville, Illinois where the victim's credit card was used to purchase two pairs of women's shoes and some hosiery. Later that same day, May 30, 1987, Wilson and Humphrey went to a K–Mart in Danville where the victim's credit card was used to make purchases totalling $227.46. Included in these purchases

were a man's Seiko watch and a woman's Gruen watch for $68.00 each. Wilson and Humphrey also paid cash for a number of cosmetic items and some clothing. Later that day, the victim's credit card was used to make a $24.50 purchase at an Amoco gas station in Urbana–Champagne, Illinois.

On Sunday, May 31, Wilson and Humphrey returned to the home of Humphrey's best friend, Beverly Finkenstead. Finkenstead testified that Humphrey had a K-Mart bag with a blouse in it. They both had a watch on and were each wearing a necklace. On Sunday, June 7, Humphrey visited Finkenstead and told her details of the crimes in which she and Wilson had participated the previous weekend. Eight days later, on June 15, Finkenstead reported to the police what Humphrey had told her. Also on June 15, the Hendrix County, Indiana Sheriff's Department was summoned to a wooded thicket where a corpse had been discovered.

Authorities were able to determine the identity of the corpse only by comparing its remaining teeth with the victim's dental X-rays. The cause of death could not be determined due to the absence of internal organs. A forensic entomologist testified that, based on the extent of blowfly maggot development in and on the corpse, the estimated time of death had occurred 15 to 19 days prior to his June 16 examination of the corpse.

Wilson told cell mate Willis Maloney details of the crimes including that the initial intent had been to "snatch" the victim and rob her; that the victim was still alive when her money was taken from her; that the victim was killed before they crossed the state line into Indiana; that the corpse would be so badly decomposed that no sperm would show up; and that they had used the victim's credit card to purchase, among other things, a watch Wilson was wearing at the time of his arrest which Humphrey later obtained by signing it out from one of the jailers. Wilson also told Maloney, "I bet they can't find what I used to strangle her with."

Maloney's and Humphrey's account of the rape was corroborated by the presence of semen on the back seat of the victim's car. Head hairs similar to those belonging to Humphrey were found inside the victim's car. Pubic and head hairs similar to those belonging to Wilson were also found inside the victim's car. A handwriting expert established that Humphrey had authored the forged credit card receipts. A search of the hotel room where Wilson and Humphrey were arrested produced various items of clothing, all bearing K–Mart price tags.

Humphrey was the only defense witness during the guilt/innocence phase of the trial. Wilson gave his own closing argument in which he told the jury he was not guilty, he "never met nor knew the victim" and that Humphrey told her sister that she killed the victim. The jury returned guilty verdicts against both defendants. After the penalty phase, Wilson was sentenced to death for kidnapping and murder. He was sentenced to consecutive prison terms of 20, 20 and 10 years respectively for first-degree rape, first-degree robbery and criminal conspiracy to commit robbery.

Wilson, through appellate counsel, raises twenty-four assignments of alleged error in this appeal. We have carefully reviewed all the issues presented by Wilson and this opinion will concentrate on the question of whether Wilson was denied his right to counsel or effective assistance by the appointment of volunteer counsel William Hagedorn and John Foote. Allegations which we consider to be without merit will not be addressed here.

## I & II

Wilson argues that the trial court deprived him of his right to counsel, effective assistance of counsel and equal protection by refusing to grant his pretrial motion to discharge his appointed volunteer counsel who he claims were not competent to represent a capital defendant.

On July 1, 1987, Clyde Richardson and Steve Megerle were appointed to represent Wilson. Trial was set for October 27, 1987. Richardson filed an affidavit concerning his poor health and sought a continuance. At a subsequent hearing, Megerle revealed

that he wanted to withdraw because of a conflict since he had previously represented witnesses for the Commonwealth.

On November 9, 1987, Megerle was permitted to withdraw and Kevin McNally from the Department of Public Advocacy was appointed and advised that another local counsel would be appointed soon. At a subsequent hearing, the trial judge set a September, 1988 trial date and indicated that he would help the local public defender administrator, Robert Carran, find local counsel. In the meantime, McNally filed a motion to withdraw because he was resigning from the DPA and had never planned to be lead counsel in the case. The DPA declined to replace McNally. Public Advocate Paul Isaacs testified that even though DPA lawyers had handled all 34 of Kentucky's other capital cases, they were too busy to take on this one. On May 17, 1988, Judge Lape posted at the Kenton County Courthouse a "Plea" for counsel to represent Wilson.

On June 1, 1988, the trial court entered an order permitting McNally to withdraw from representing Wilson and ordered him to turn over Wilson's file to William Hagedorn, who had responded to the Judge's plea for counsel, with an offer to represent Wilson *pro bono* as lead counsel. He also appointed John Foote and Sharon Sullivan, ordered that Richardson remain as co-counsel and ordered that Richardson, Foote and Sullivan "shall be allowed the appropriate fee for their services through the Northern Kentucky Public Defender, Inc." Sullivan, two weeks later, asked the Court to reconsider the order appointing her as counsel.

On July 6, 1988, the trial court permitted Richardson and Sullivan to withdraw and directed Richardson to turn Wilson's file over to Hagedorn. Wilson then filed a *pro se* motion to disqualify Judge Lape and objected to the order regarding turning over his files. A hearing on Wilson's motion was conducted on August 16, 1988. Wilson was represented at the hearing by Mario Conte of the National Association of Criminal Defense Lawyers. Wilson's apparent purpose was to argue that Hagedorn and Foote were not competent to rep-

resent him in a capital case. When Conte attempted to bring forth evidence of Hagedorn's alleged past unethical behavior, the trial judge terminated the hearing.

At many points during the trial, Wilson repeated his assertion that his court-appointed standby counsel were, to use Wilson's words, "unprepared, ill-trained, ill-equipped, and lacked the necessary competence and experience" and objected to the proceeding based on the Sixth, Eighth and Fourteenth Amendments. Wilson made these assertions despite the fact that the record indicated that Hagedorn had previously tried fifteen murder cases.

■ Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in order to prevail under an ineffective assistance of counsel claim, a defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. 466 U.S. at 687, 104 S.Ct. at 2064. A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the

particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and make all significant decisions in the exercise of reasonable judgment. 466 U.S. at 690, 104 S.Ct. at 2066. Any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. 466 U.S. at 692, 104 S.Ct. at 2067.

This Court has applied the *Strickland* standard in the death penalty cases of *Gall v. Commonwealth,* Ky., 702 S.W.2d 37 (1985), *McQueen v. Commonwealth,* Ky., 721 S.W.2d 694 (1986) and *Moore v. Commonwealth,* Ky., 771 S.W.2d 34 (1988).

■ Applying the *Strickland* standard to this case, we cannot accept Wilson's contention that he was denied effective assistance of counsel. A careful examination of the record indicates that Wilson's own actions severely hampered the efforts of counsel to assist him. Prior to the start of *voir dire,* Wilson told the trial court that he was rejecting the advice and assistance of Hagedorn and Foote. However, Wilson's brief fails to allege that even one juror was improperly impaneled. Wilson did not allow defense counsel to make an opening statement or closing argument during the guilt phase of the trial. Wilson did not testify or allow counsel to call any defense witnesses. Wilson repeatedly told the court that Hagedorn and Foote did not represent him but that he could not represent himself.

Wilson did allow Hagedorn to cross-examine ten of the prosecution witnesses. The record indicates that to the extent that Hagedorn was permitted to participate by Wilson, his performance was effective. He elicited from the forensic pathologist that the cause of death was unknown and that there was no evidence of rape on the victim's corpse. He effectively challenged the credibility of the entomologist who had estimated the time of death. He got the witness to admit that he had been told the date of the victim's disappearance prior to his examination of the corpse and resulting opinion.

Hagedorn made a detective concede that when he had said no fingerprints were found on the victim's car, he really meant that none of the defendants' fingerprints were found because theirs were the only fingerprints being considered. He brought out testimony that Caucasian pubic hairs dissimilar to the victim's were found inside the car; none of the fibers from Wilson's clothes matched any fibers taken from the victim's car; and that blood found inside the car could have been there for years because the age of blood cannot be scientifically determined.

Wilson's brief is highly critical of what he terms lengthy and bizarre remarks of Hagedorn prior to his sentencing. However, we have read the remarks, and considering the whole content, find them to be a plausible and thought-provoking argument against imposing the death penalty.

■ Wilson in his reply brief contends that the *Strickland* standard is not applicable and that the issue is whether the trial court's refusal to grant his *pro se* pretrial motion to discharge his appointed counsel deprived him of his rights to counsel, effective assistance of counsel and equal protection. He contends that the bottom line is that he did not and could not trust his appointed counsel and that the trial court should have conducted an extensive inquiry into his appointed counsel's background, qualifications, fitness and alleged prior acts of misconduct.

We rejected a similar contention in *McQueen, supra,* wherein this Court unanimously stated:

There is no basis for McQueen's argument that death penalty cases are so different as to represent an entirely different area of expertise. *Strickland, supra,* sets the standard for effectiveness of counsel and it was a case involving the death penalty. 721 S.W.2d at 701.

Justice O'Connor correctly observed in *Strickland:*

The availability of intrusive post trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of in-

effectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases and undermine the trust between attorney and client. 466 U.S. at 690, 104 S.Ct. at 2066.

The consequences of adopting the intensive pretrial scrutiny of counsel such as advocated by Wilson would have an even more devastating and adverse effect. If such a standard were adopted, we shudder to think of the impact it would have on the willingness of attorneys to serve indigent defendants *pro bono*.

We are mindful of the authority cited by Wilson but we fail to find in those cases any grant of authority for a trial court to allow an indigent defendant to put his appointed counsel on trial for alleged past transgressions. *Sawicki v. Johnson,* 475 F.2d 183 (6th Cir.1973), was decided *pre-Strickland* and involved a situation where the defendant's appointed counsel was dismissed by the trial court and the defendant was forced to proceed without counsel. In *Wilson v. Mintzes,* 733 F.2d 424 (6th Cir. 1984), ineffective assistance was found where defense counsel stated in the presence of the jury that he refused to make any further objections; that he refused to continue the trial; and that he was no longer the defendant's attorney. This case presents no such situation.

■ In order to warrant a substitution of counsel during trial, a defendant must show good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict which leads to an apparently unjust verdict, and demonstrate prejudice by the attorney's performance. *Wilson, supra,* 733 F.2d at 427, 428. Applying the standards set by the Sixth Circuit, we find that Wilson was not denied effective assistance in this instance. Wilson has failed to demonstrate in any way that he was prejudiced by Hagedorn's performance. Considering all the evidence of guilt, we fail to see how the verdict would have been any different had Wilson been supplied with the best criminal defense attorney in the nation.

### III

■ Wilson claims that the trial court violated Kentucky Revised Statutes Chapter 31 and deprived him of his rights to effective assistance of counsel and equal protection by circumventing the public defender system and appointing unqualified volunteers rather than ordering the fiscal court to provide adequate funds so that the public defender administrator could assign competent, qualified counsel to represent him.

We find no merit to this contention. Wilson concedes in his reply brief that neither Chapter 31 of the statutes, nor the United States or Kentucky Constitutions, prohibit a circuit judge from appointing a volunteer *pro bono* member of the bar to represent a defendant in a capital case. For reasons stated previously in arguments I and II, we reject Wilson's contention that Hagedorn and Foote were unqualified volunteers appointed to prevent the public defender from assigning competent, qualified counsel.

### IV

■ Wilson argues that the trial court deprived him of his right to counsel by forcing him to proceed *pro se* over his repeated objections and then isolated him from any advice other than that of the appointed counsel to whom he objected.

Wilson's counsel asserted during oral argument that the trial court committed reversible error of a constitutional dimension by failing to force him to accept Hagedorn and Foote as his attorneys. Wilson's counsel was questioned as to whether he could cite any authority in support of his position. Counsel responded by citing *Marshall v. Dugger,* 925 F.2d 374 (11th Cir. 1991) and argued that the Sixth Amendment right to counsel was more important and outweighed a defendant's rights under

*Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

In *Marshall, supra,* however, the trial judge only inquired of the defendant whether he wanted to represent himself. When the prosecutor requested that the trial court explain to the defendant the drawbacks and disadvantages of proceeding *pro se,* the trial judge stated:

I believe that Mr. Marshall is aware of what it's going to be like to represent himself. He is not unfamiliar with the system, shall we say, and obviously it's better to have an attorney than not have an attorney. 925 F.2d at 376.

The prosecutor proceeded to warn the defendant of some of the dangers of proceeding *pro se.* The trial court made no other inquiry into the defendant's awareness of proceeding *pro se.* The defendant's discharged attorney left the courtroom and trial then proceeded with the defendant representing himself alone. The Court went on to find that under the law of the circuit, Marshall's actions were insufficient to invoke the Sixth Amendment right of self-representation. The trial court committed reversible error in forcing Marshall to proceed without counsel.

We do not, however, find any language in *Marshall* which suggests that the trial court should have forced the defendant to have continued to accept the representation of the assistant Public Defender.

In this case the trial judge repeatedly tried to warn Wilson of the hazards he was facing. During jury selection, before individual *voir dire* began, Wilson told the trial court that he was rejecting the advice and assistance of Hagedorn and Foote and that he was proceeding *pro se.*

The trial court responded by twice asking Wilson whether any other lawyers had agreed to defend him. Wilson answered negatively both times. At that point the trial court advised Wilson of his constitutional right to proceed *pro se* with the assistance of standby counsel appointed to represent him:

You do not have to accept Mr. Foote or Mr. Hagedorn. You may go out there, sir, under *Faretta versus California* and

represent yourself. I am appointing, and have appointed, and will appoint Mr. Hagedorn and Mr. Foote to represent you. If you do not wish them to represent you, they will be out there to assist you if you wish. If you wish to represent yourself, under the Constitutional Amendments you have indicated to me, sir, you certainly have that right, and I will certainly let you do that.

Wilson responded, "I do."

Moments later, Wilson said he did not "want to proceed *pro se*" because "I don't know how to proceed *pro se.*"

Judge Lape also explained to Wilson his option of proceeding *pro se* with the benefit of standby counsel. Judge Lape was also careful to explain at some length the perils of proceeding *pro se:*

Now, Mr. Wilson, you had indicated in your motion before that you were not going to permit Mr. Foote and Mr. Hagedorn to represent you for the reasons you have outlined in that, and I've advised you that under *Faretta v. California,* 95 Supreme Court 225, or 2525, that you're certainly entitled to represent yourself. But it's also my obligation to tell you, sir, after you have indicated to me that you're not skilled, that a Defendant need not himself have the skill and experience of a lawyer in order to completely or competently and intelligently choose self representation. You should be made aware of the dangers and disadvantages of self representation so that you know that what you're doing you're doing with your eyes open. In other words, sir, if you choose to represent yourself as you indicated, this the capital offense case, you choose to do that, you know the consequences, you could certainly be sentenced to the electric chair should the jury find you guilty and then subsequently order that and if I agree. So knowing that, you certainly have the right to represent yourself, but I want you to understand that if you do so, you do so at that risk.

Judge Lape then engaged in an on-the-record colloquy with Wilson to make absolutely certain that Wilson's decision to pro-

ceed *pro se* was knowing, intelligent and voluntary:

MR. BURING: Judge, quite simply, in light of the events of this morning with respect to Mr. Wilson, Defendant Wilson in this action representing himself, I wanted to call to the attention of the Court a case by the name of *United States v. McDowell,* It's a Sixth Circuit court case, 814 F.2d 245, decided in 1987, and I have a copy, I want to have two copies, I have one for the Court. But what I find most interesting with respect to this, it's a similar issue, and what I would like to call to the Court's attention and for the Court's review at this time, that where an individual wants to represent himself, there are apparently in the guidebook for District Judges of the Federal District Court in a book entitled Bench Book for United States District Court Judges questions that the Sixth Circuit, which obviously covers this jurisdiction federally say ought to be asked and ought to have a clear understanding. And before we start to proceed again, I just wanted to tender this to the Court. If the Court wanted to take a few moments to review that and feel, so that it feels that it's comfortable—

JUDGE LAPE: Okay.

MR. BURING:—in its discussions with Mr. Wilson, then we can proceed from there, but I thought we'd take care of that at the present time rather than wait.

JUDGE LAPE: Mr. Buring, I've reviewed that, and I believe that many of the questions that would be asked have been answered in the comments that Mr. Wilson made to me in chambers before out of the presence of the jury in the presence of his appointed counsel and the counsel for Ms. Humphrey, and Ms. Humphrey herself. However, there was a couple of matters in here that I did not address, so, therefore, I'm going to ask these questions of Mr. Wilson. He can choose to answer them. He doesn't have to answer them. Mr. Wilson, have you ever studied law?

DEFENDANT WILSON: No, sir.

JUDGE LAPE: Have you ever represented yourself in a criminal action?

DEFENDANT WILSON: No, sir.

JUDGE LAPE: You realize, do you not, sir that you are charged with the crimes of kidnapping, murder, robbery, rape, and conspiracy?

DEFENDANT WILSON: Yes, sir.

JUDGE LAPE: Do you realize that if you're found guilty of the crimes, or any crime, that you could be sentenced to the penitentiary for a term of years and the ultimate could be that you could be sentenced to the electric chair?

DEFENDANT WILSON: Yes, sir.

JUDGE LAPE: Do you realize that if you represent yourself, I cannot tell you how to try the case, or even advise you as to how to try the case, but I will say this, that if there are any objectionable matters brought up by the Commonwealth Attorney, I shall so state that in the record.

DEFENDANT WILSON: Well, I'd like to assert myself. I don't know how to defend myself.

JUDGE LAPE: Okay. But I'm going to let you make a statement after I ask you these questions.

DEFENDANT WILSON: All right.

JUDGE LAPE: All right, sir. Are you familiar with the Kentucky Rules of Criminal Procedure and of evidence?

DEFENDANT WILSON: No, sir.

JUDGE LAPE: All right. Do you realize that those are the rules that provide how trials are conducted?

DEFENDANT WILSON: Yes, sir.

JUDGE LAPE: Do you realize that if you decide to take the witness stand, you must present your testimony by asking questions of yourself?

DEFENDANT WILSON: Yes, sir.

JUDGE LAPE: Okay. All right, sir. Then it is my opinion that it would be far better for you to be defended by a trained lawyer than by representing yourself. I believe and think it is unwise of you to try to represent yourself. You're not familiar with the law, you're not familiar with the court procedure, you're not familiar with the rules of evidence, and at this time as I did earlier, I

strongly urge you not to try and represent yourself.

*DEFENDANT WILSON:* May I speak?

*JUDGE LAPE:* Is it your decision entirely? Is it voluntary on your part, sir, to not have Mr. Hagedorn and Mr. Foote whom I have assigned to your case? Is it your desire to voluntarily represent yourself?

*DEFENDANT WILSON:* I'm not voluntarily representing myself. I don't know how to represent myself. I can't represent myself. But I have a right to competent counsel.

*JUDGE LAPE:* Well, we've gone over that, I'm asking you, did you wish to represent yourself in these proceedings. If you do, I want—Are you doing this voluntarily, other than what you've said?

*DEFENDANT WILSON:* I don't know how to defend myself.

*JUDGE LAPE:* All right. Very good, All right. I still assign Mr. William Hagedorn and John Foote as your counsel. If you wish to have them—

*DEFENDANT WILSON:* I object.

*JUDGE LAPE:* If you wish to have them assist you, sir, you may certainly request them to do so. If you choose not to, you voluntarily relinquish their representation. And at this time, I find that the Defendant has knowingly and voluntarily waived his right to use counsel if he so chooses, and I will permit him to represent himself, or to request of the two assigned lawyers to him to help him if he so chooses. Now, wait a minute, Mr. Wilson wanted to make a statement, Mr. Hagedorn.

*DEFENDANT WILSON:* No. I've said what I've had to say.

*JUDGE LAPE:* You finished? You have. All right, sir.

It is clear from a reading of the record that the trial judge zealously made Wilson aware of the dangers of the path that he had chosen.

In *Wake v. Barker,* Ky., 514 S.W.2d 692 (1974), this Court, citing *Adams v. United States, ex rel. McCaun,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942), stated:

The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law.... The Constitution does not force a lawyer upon a defendant. 514 S.W.2d at 695.

In *United States v. McDowell,* 814 F.2d 245 (6th Cir.1987), the Federal trial judge's inquiry into the defendant's decision to proceed *pro se* was much less extensive than that by the trial judge in the present case, but the Sixth Circuit found it to be sufficient. The Court also rejected the defendant's argument that the trial court was required to *sua sponte* declare a mistrial on grounds that the defendant was not receiving a fair trial. The Court found that the only thing "unfair" about the trial was that the defendant was not representing himself very well and that he had refused to make use of the standby counsel appointed by the court. 814 F.2d at 247–251.

In *United States v. Kelm,* 827 F.2d 1319 (9th Cir.1987), the defendant was indicted on two counts of willful failure to file federal income tax returns. The trial was continued four times due to the defendant's failure to retain counsel. Prior to trial, a hearing was held for the purpose of determining the status of Kelm's efforts to retain counsel. Kelm, through standby counsel, informed the court that he had been unable to obtain counsel, but that he did not want to waive his right to representation. The Court made a finding that the use by Kelm of a detailed questionnaire to counsel and a requirement that counsel be an experienced tax trial lawyer had deterred and hindered counsel selection.

The case was eventually tried with Kelm conducting his own defense, assisted by standby counsel. On the second day of jury trial, Kelm informed the Court he was unable to represent himself and asked that counsel be appointed. The request was denied. After he was found guilty on both counts, Kelm appealed on the basis that he was denied effective representation of counsel under the Sixth Amendment.

The Ninth Circuit rejected this argument and found that:

In light of Kelm's persistent refusal to accept an appointed attorney, to hire his own attorney, or to expressly waive his right to an attorney, the district court's decision not to grant further continuances was "fair and reasonable." Moreover, we think it is a fair reading of the record as a whole that Kelm understood the dangers and disadvantages of self-representation. He knew he was entitled to counsel, yet the record establishes that he elected to defend himself with open eyes. (Citations omitted.) 827 F.2d at 1322.

Wilson's trial was delayed over a year due to problems in procuring an attorney to represent him. As in Kelm and McDowell, we believe that a fair reading of the record as a whole clearly indicates that Wilson understood the dangers and disadvantages of self-representation. He knew he was entitled to counsel, yet the record clearly establishes that he elected to proceed with his eyes wide open.

Wilson's course of conduct during the trial in his persistent refusal to accept his appointed counsel, his refusal to hire his own attorney or to expressly waive his right to an attorney, and his insistence that the court appoint him an attorney who met Wilson's specifications as a death penalty expert clearly put the trial judge between the proverbial rock and a hard place. We believe that the trial court's decision to allow Wilson to proceed with standby counsel was under the circumstances fair and reasonable.

Wilson also complains that the trial court isolated him from advice other than that of the appointed counsel to whom he objected. We find no merit in this contention. The trial court was only reinforcing the rules established by the Kenton County Jail. Contact visits with jail inmates are only permitted with counsel of record, clergy and certain other governmental officials such as social workers. Wilson wanted attorneys Kevin McNally, Neil Walker and Bob Carran to be allowed contact visits. None of these individuals were counsel of record and consequently they were prohibited by jail regulations from contact visits. This Court rejected a similar claim in the death penalty case of *Moore v. Commonwealth, supra.* The trial court correctly informed Wilson that any individual could visit him during regular visiting hours.

V

Wilson claims he was denied his right to a public trial. His complaint stems from the removal of then-DPA lawyer Gail Robinson at the trial court's behest. Wilson also offers a litany of incidents he alleges were attempts by the trial judge to isolate him from friends and supporters.

Near the outset of the trial, the trial court informed the spectators of behavior deemed inappropriate in the courtroom. The next day, the trial court again reminded the spectators that gestures between spectators and any party involved would not be permitted and would result in the spectator's being removed from the courtroom. Later, court personnel informed the judge that a spectator was laughing and making facial expressions while a juror was being questioned. Once again, the court admonished the audience concerning proper courtroom behavior.

After lunch break on the last day of testimony during the guilt phase, Attorney Foote notified the court at the bench that he had observed a spectator attempting to make contact with Wilson. Wilson informed the court that the spectator was Gail Robinson. The court had the bailiff tell Robinson to leave. Instead of complying with the bailiff's request, she asked to address the court. The judge refused the request and asked her to leave. We cannot accept Wilson's assertion that Robinson's removal denied him his right to a public trial. She was ejected from the courtroom for failure to comport with reasonable guidelines established by the judge to maintain order and decorum. The exclusion of one person from the remainder of cross-examination of the last witness in the guilt phase of a trial can hardly be characterized as a denial of a public trial. There is no question present invoking denial of a

public trial. We believe that the trial judge was acting within his authority to maintain control of the courtroom. *Preston v. Commonwealth*, Ky., 406 S.W.2d 398 (1966).

■ Wilson also complains that his friend, Eddie Thompson, was excluded from the courtroom. We find no merit in Wilson's complaint. Thompson was subpoenaed by the Commonwealth in anticipation of being called as a possible witness. Wilson had filed affidavits which Thompson witnessed. If Wilson testified, the Commonwealth anticipated that introduction of the affidavits via Thompson might be necessary for impeachment purposes. The trial court had invoked the separation of witnesses rule and therefore Thompson had been legitimately excluded from the proceedings. In any event, Wilson stipulated that he signed the affidavits. Consequently, Thompson was allowed to rejoin the spectators, having missed only a portion of the voir dire proceedings.

### VI

Wilson contends that his rights of confrontation and due process were violated by the trial court's denial of requests for relevant impeachment information concerning prosecution witness Maloney.

■ Wilson requested a very long list of information to attack Maloney's credibility. Wilson claims such information was exculpatory and was required to be disclosed under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Among some of the items requested were copies of all correctional institution files of the witness; any organizations to which Maloney had ever belonged; any information Maloney may have provided to any governmental authority in any jurisdiction in any case; any prior instances of Maloney ever lying or exaggerating; any inmates the Commonwealth may have interviewed at the jail to determine whether they spoke with Wilson; and every case in which the Commonwealth used informants. Clearly Wilson's request exceeded any possible exculpatory material or information properly attainable under RCr 7.24.

*United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), held that under the *Brady* standard of disclosure, a prosecutor will not have violated his or her constitutional duty of disclosure unless his omission is of such a significance to result in the denial of the defendant's right to a fair trial.

We have carefully examined the record in this case and find that the prosecutor disclosed all the relevant information he was required to disclose under RCr 7.24. Moreover, Wilson fails to show how any of the requested information allegedly not disclosed could have possibly affected the outcome.

Wilson has no complaint of denial of cross-examination. He received the information to which he was entitled. Even with this information, Wilson chose not to cross-examine Maloney.

### VII

■ Wilson claims that the trial judge should have been disqualified from the case because he had a personal bias and hostility toward Wilson; that he had prejudged the case and his presence gave the appearance of partiality.

Wilson argues that the trial judge exhibited bias and hostility toward him by allegedly calling him an asshole; noting that apparently Wilson did not trust any lawyer; expressing a belief that Wilson was engaging in obstructionist tactics, and speaking to Wilson in an angry tone of voice before the jury.

Wilson filed a motion on July 29, 1988 to have the trial judge recuse himself. The motion was forwarded to the Chief Justice of the Kentucky Supreme Court to be considered as a recusal affidavit pursuant to K.R.S. 26A.020(1). The Chief Justice denied the motion, finding it insufficient to indicate that a special judge should be appointed. After a thorough review of the record we find that Wilson's showing is still insufficient.

Wilson fails to make any citation to the record where the trial court stated he was engaged in obstructionist tactics. As to

the alleged asshole comment and the trial judge's tone of voice, this Court has taken judicial notice of the toll a lengthy capital trial exacts on a trial judge. *Scruggs v. Commonwealth*, Ky., 566 S.W.2d 405 (1978). Even if the trial judge did make an intemperate remark, whether Wilson's rights were violated must be determined from the whole record. *Preston, supra.*

An exhaustive reading of the entire record indicates that the trial court treated Wilson with respect and allowed Wilson to insert anything he desired into the record to ensure Wilson received a fair trial. We have documented earlier the trial court's efforts to advise Wilson of the hazards of proceeding without counsel. The trial court even informed Wilson that if the Commonwealth brought up objectionable matters, the court would so state in the record. The court allowed Wilson to file, almost daily, the same motion for fairness and justice. The judge even permitted Wilson a recess immediately before his closing statement because Wilson did not feel "too good right now." Considering all the circumstances of this case, we believe that the trial court showed great patience and excellent judicial temperament in the conduct of the trial.

Wilson's charge that the trial judge had prejudged the issues is not supported by the record. The trial court's comment that Wilson doesn't trust attorneys is not without foundation. As early as January 4, 1987, Wilson was complaining about his attorneys' actions on his behalf. However, viewed in the whole context, the remark by the trial court appeared to indicate that the court was concerned about providing Wilson with counsel with whom he had some rapport.

We also reject Wilson's contention that the trial court prejudged his case because it indicated Hagedorn and Foote would be counsel for Wilson at the September 1, 1988 trial date. The context is important when considering the judge's remarks. Hagedorn wanted to know whether he was going to be responsible for trying the case on September 1, 1988. The trial court's need to ensure at that point continuity of counsel cannot be deemed an expression of prejudging the case.

We find no merit in Wilson's allegation that the trial court had prejudged the case because he assumed appointed counsel was competent and refused to permit allegations of unethical conduct against Hagedorn. We have rejected this argument previously. A trial judge does not prejudge by making a pretrial assumption that counsel is competent. Counsel must be assumed competent until the performance of counsel in a particular case before the court demonstrates the contrary. *Strickland v. Washington, supra; United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

Wilson finally contends that even if the trial court were not prejudiced, the appearance of partiality existed mandating reversal. K.R.S. 26A.020(1) is a safeguard available to defendants for determination before trial of the existence of alleged partiality by the trial court. This procedure was available and used by Wilson. No adequate showing of partiality was demonstrated.

## VIII

Wilson asserts that the failure to grant him a separate trial from Humphrey denied him a fair trial and reliable sentencing contrary to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 11 and 17 of the Kentucky Constitution.

It is clear that significant interests are served by having a joint trial of the accused and the codefendant before a single jury as to both the guilt and penalty phases because much of the same evidence would be presented at both phases of the capital trial. It is appropriate not to burden the prosecution or the defense with having to present the evidence and testimony twice. Also underlying the state's interest in a joint trial is a related interest in promoting the reliability and consistency of the judicial process, an interest that may benefit the noncapital defendant as well, because the jury obtains a more complete view of all the acts relating to the charges than

would be possible in separate trials and may be able to arrive more reliably at its conclusion regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant at sentencing. The state's interest in a joint trial is also connected to a concern that it not be required to undergo the burden of presenting the same evidence to different juries where two defendants, only one of whom is eligible for a death sentence, are charged with crimes arising out the same events. *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987).

Due to this legitimate preference for joint trials, a defendant is not entitled to severance unless he makes a positive showing prior to trial that joinder would be unduly prejudicial. RCr 9.16; *Commonwealth v. Rogers,* Ky., 698 S.W.2d 839 (1985).

■■■■ A reviewing court will not reverse a conviction for failure to grant separate trials unless it is clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge as to make his failure to grant severance an abuse of discretion. *Epperson and Hodge v. Commonwealth,* Ky., 809 S.W.2d 835 (1991); *Wilson v. Commonwealth,* Ky., 695 S.W.2d 854 (1985); *Rachel v. Commonwealth,* Ky., 523 S.W.2d 395 (1975). A defendant must show that antagonism prevented a jury from being able to separate and treat distinctively evidence that is relevant to each particular defendant at trial and that the antagonism between codefendants will mislead or confuse the jury. *Cf. United States v. Gallo,* 763 F.2d 1504 (6th Cir.1985); *United States v. Horton,* 847 F.2d 313 (6th Cir.1988).

■■■■ Wilson complains that Humphrey asserted a coercion defense which was antagonistic with his lack of a defense. That the defenses of jointly indicted persons may be antagonistic is only a factor for the trial court to consider in making his or her determination as to whether a defendant will be prejudiced by a joint trial. *Rachel, supra; McQueen, supra.* Wilson has failed to point out any specific reference in the record where he was unduly prejudiced by this.

Wilson also argues that evidence unrelated to him was introduced during his trial but would have been excluded had separate trials been granted. He contends that this constitutes error under *Cosby v. Commonwealth,* Ky., 776 S.W.2d 367 (1989). We do not agree. In *Cosby,* a codefendant's statement that the other defendant alone stabbed the victim required reversal for failure to provide separate trials even though the court admonished the jury that the statement was not evidence against the defendant. However, the case against the defendant in *Cosby* was not overwhelming and was based on circumstantial evidence. The codefendant's statement was the only evidence of defendant's use of a knife, and the closing argument by codefendant's attorney implied that the defendant was the "blank" referred to in the statement. *Cosby* is not applicable to this case. Both Wilson and Humphrey admitted the crimes to other persons. The evidence presented during the guilt phase against Wilson was largely the same evidence against Humphrey. Moreover, Humphrey testified during the case-in-chief and was subject to cross-examination by Wilson.

We fail to find how the joinder unduly prejudiced Wilson. Wilson was the one who actually raped and killed the victim, so it was not unexpected for him to receive greater punishment than Humphrey on those charges. The same was true concerning the kidnapping charge for it was Wilson more so than Humphrey who actually prevented the victim from being released alive. The jury found Wilson and Humphrey equally guilty on the robbery charge.

The extent of Humphrey's participation in the crimes was significant, but this distinction could have been lost on the jury in her absence from Wilson's trial. Humphrey's presence served as a reminder to the jury that Wilson was not solely responsible for the crimes. Under these circumstances, we find no abuse of discretion by the trial court.

## IX

■ Wilson alleges that the trial court denied him a fair trial by denying his request for a change of venue and refusing to sequester the jury during the trial. Wilson did not file a motion for a change of venue pursuant to K.R.S. 452.210 and consequently there was no hearing by the trial court specifically on this issue. However, after carefully reviewing the record we find that there was no indication that the seated jury was anything but fair and impartial.

■ Under either the due process clause or K.R.S. 452.210, a change of venue should be granted if it appears that the defendant cannot have a fair trial in the county wherein the prosecution is pending. *Brewster v. Commonwealth*, Ky., 568 S.W.2d 232 (1978). In order for a change of venue to be granted there must be a showing that: 1) There has been prejudicial news coverage, 2) It occurred prior to trial, and 3) The effect of such news coverage is reasonably likely to prevent a fair trial. *Brewster, supra,* citing *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The mere fact that jurors may have heard, talked or read about a case is not sufficient to sustain a motion for change of venue, absent a showing that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant. *Brewster.* The trial court has discretion in this determination and will not lightly be disturbed. *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384 (1985).

An examination of the record indicates that, although almost every potential juror had heard or read something about the initial disappearance of the victim or arrest of the defendants, most did not remember details and had not prejudged the case.

The trial court allowed the Commonwealth ten peremptories and each defendant fourteen. A panel from which to exercise peremptories was obtained after individual *voir dire* examination of only 56 potential jurors. Of the 56, only four were excused for cause. Only one juror of the four excused for cause had to be excused because he had prejudged the case. Of the remaining 52 jurors only three had any knowledge of Wilson's problem vis-a-vis his counsel. All three indicated they had no problem with Wilson being involved in the defense of his case and this fact would have no effect on their ability to sit as a juror. Only one of these individuals served on the jury. There was no showing that the media accounts had pervaded the jurors and prevented Wilson from having a fair trial.

■ Wilson also contends he was denied a fair trial because the trial court failed to sequester the jury prior to the submission of the case for determination of guilt and between the guilt and sentencing stages of the trial. We do not agree. The decision to sequester the jury resides within the discretion of the trial court from the onset of the proceedings. The trial court undertook proper precautions to insure the jury was isolated from spectators, parties and the press. Once selected, the jury was kept together as a group and properly admonished. Prior to resumption of the sentencing hearing, the trial court questioned the jurors about any possible media exposure. No juror responded affirmatively. Wilson has failed to demonstrate how he suffered any prejudice by the exercise of the trial court's discretion.

## X

■ There is no evidence in the record that Wilson was tried by anything other than a fair and impartial jury. His assertion that the jury selection process was a "sham" is without merit. Wilson, on his own, decided not to participate in the *voir dire* process and did not seek to remove jurors for cause. The trial judge carefully explained the procedure for exercising peremptory challenges but Wilson refused to exercise his challenges or allow his standby counsel to assist him. Attorney Hagedorn had prepared a general *voir dire* which would have taken some time to complete. Hagedorn and attorney Foote were also prepared to question prospective jurors during the individual *voir dire*. On the first day of individual *voir dire*, Wilson did

allow Foote to question prospective jurors. It was not until the second day of individual *voir dire* that Wilson prohibited his standby counsel from participating in further individual *voir dire*. He cannot be heard to complain that he did not receive a fair and impartial jury. *Stanford v. Commonwealth*, Ky., 734 S.W.2d 781 (1987).

In addition, Wilson cannot effectively maintain that he was prejudiced in any way because of a lack of information in regard to the jury data sheets/questionnaire.

 There is no indication that the jury panel was not representative of blacks. Wilson's calculation of blacks on the panel was 4.76%. This figure is within the range of blacks in the community which is indicated in the record to be no more than 7%. The jury panel was selected at random by a computer process operated by the Secretary of State. An examination of the record indicates that there was no violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecution exercised one peremptory challenge against a black person and a suitable neutral explanation was given for the exclusion of this juror.

## XI

 Wilson's argument that he was deprived of a fair trial and due process by the admission of unnecessary and inflammatory photographs and testimony is totally without merit. An examination of the photographs in the record indicates that there are no gruesome photographs of a corpse or anything else that would serve to inflame or prejudice the jury. The photos disclose a great deal of foliage in a rural setting and the location and condition of the body. No photograph reflects any inflammatory scene. The introduction of a single photograph of the victim taken before death was permissible. *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519 (1984). Wilson also objected to the testimony of the forensic entomologist concerning blowfly life cycles. We find no error in allowing the testimony. The condition in which the victim's corpse was found was an important issue of fact. The testimony was also relevant to the issue of when the victim died.

## XII

 Wilson was not denied equal protection of the law or due process because no independent experts testified in his behalf. Wilson contends that the prosecution relied heavily on the expert testimony of a pathologist, entomologist and serologist while he was without expert assistance.

Wilson now claims that his counsel refused to obtain the assistance of experts. On February 11, 1988, the trial judge allocated $2,500 for the use of experts to assist the defense and indicated that as the need arose for more funds, if any, the necessity for such expenditures would have to be approved by the court. Wilson's attorney at that time, Kevin McNally, had arranged for experts in hair analysis, serology and family background. Funds were approved to pay the three experts at that time. There is no indication in the record that McNally ever used these experts once the funds were made available. When attorney McNally was released as counsel of record, he declined to turn over defense files to Wilson's appointed standby counsel without authorization from Wilson, and Wilson refused to allow the new counsel access to the files.

As we have previously noted, although Wilson intermittently refused to accept the assistance of his standby counsel, he did want attorney Hagedorn to cross-examine the "scientific witnesses." The record indicates that Hagedorn effectively cross-examined the pathologist, the entomologist and the serologist.

The expert testimony of the prosecution simply tended to corroborate the testimony of other lay witnesses. Wilson does not indicate exactly how the use of his own experts might have affected his own defense or the ultimate outcome of the case. He refused to allow his standby counsel to call any witnesses either expert or lay. Consequently, he has no basis on which to now complain to this Court. *Cf.* RCr 9.24.

## XIII

 Wilson argues that he was deprived of a fair trial by the admission of evidence of hair "matching" which was not sufficiently scientifically reliable. An expert witness testified that hairs found inside the car of the victim were similar in microscopic comparison to head and pubic hair samples taken from Wilson. Wilson's argument goes to the weight of the evidence rather than to its admissibility. The witness testified that such comparisons are not conclusive but Wilson could not be automatically ruled out. The expert testimony concerning the hair comparisons was properly introduced. *Ford v. Commonwealth*, Ky., 665 S.W.2d 304 (1983); *Murphy v. Commonwealth*, Ky., 652 S.W.2d 69 (1983).

## XIV

 Wilson claims that he was entitled to a mistrial when the mother of the victim had an allegedly emotional outburst in the courtroom. The incident occurred in the morning before codefendant Humphrey testified. Wilson did not advise the trial judge until some time after the alleged occurrence. The trial judge was skeptical of Wilson's labeling of the incident as an "outburst." The trial judge noted that he saw the woman leave and that she made no noise. There is no indication that the trial judge abused his discretion and there was no showing of any prejudice to Wilson. The record is silent as to whether the jury was even present when the incident took place. The trial judge was in the best position to determine whether any remedial action was necessary to preserve decorum and ensure a fair trial. *Preston, supra.*

## XV

 Wilson was not deprived of a fair trial when a potential juror who did not sit on the jury considering the case was not excused for cause. The right to a fair and impartial jury is not infringed if an unqualified juror does not participate in the decision of the case. *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665 (1991).

## XVI

 Wilson contends that he was deprived of his right to a fair jury by the death qualification of jurors and the exclusion of death-scrupled jurors by the prosecutor's exercise of peremptory challenges. We do not agree. It is proper to death qualify the jury in a capital case. There is no constitutional prohibition to a prosecutor using peremptory challenges to remove potential jurors. Opposition to capital punishment does not put a person in a constitutionally recognizable group exempt from peremptory challenge on that basis. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

## XVII

Wilson argues that his constitutional guaranty against double jeopardy as well as his right to be free from multiple punishments was violated when he was convicted of conspiracy to commit robbery and robbery.

 The conviction for robbery and conspiracy to commit robbery did not constitute double jeopardy under Kentucky law or the Federal Constitution. The evidence presented indicated a plan or conspiracy by both defendants to kidnap the victim and to rob her as well as to take any other illegal actions in order to achieve the successful completion of their criminal enterprise. It is clear that the codefendants intended to kidnap the victim in order to commit the robbery and subsequently the rape by Wilson and the killing of the victim by Wilson occurred. Clearly there were multiple illegal actions in the kidnapping and robbery and K.R.S. 506.110(2) applies.

## XVIII

 The imposition of the death sentence for kidnapping and a death sentence for murder was improper pursuant to the existing law of Kentucky enunciated in *Cosby, supra,* and *Taylor v. Commonwealth*, Ky., 821 S.W.2d 72 (1991). *Cosby* stated that murder and kidnapping merge at the enhancement stage. A defendant can be convicted and punished for both

offenses, but not sentenced to death for kidnapping if he is also sentenced to death for murder. This aspect of the case requires a remand for resentencing on kidnapping as a Class A Felony.

## XIX

 Wilson maintains that robbery and rape were not properly used to prove an element of kidnapping or to establish aggravating circumstances for murder and kidnapping. The basis for his argument is double jeopardy. K.R.S. 509.050 recognizes that the felonies used to support kidnapping may be punished as separate crimes. Application of the kidnapping exemption statute is on a case-by-case basis. Where the restraint goes beyond that which occurs immediately with and incidental to the commission of an offense, such as rape or robbery, the offender is guilty of kidnapping and the exemption statute does not apply. *Gilbert v. Commonwealth,* Ky., 637 S.W.2d 632 (1982). Here the restraint necessary to complete the crimes of rape and robbery was not close in distance and brief in time. *Timmons v. Commonwealth,* Ky., 555 S.W.2d 234 (1977). The victim was abducted and forced into her own car by Wilson. She was then driven by Humphrey to an area behind the flood wall where she was forced out of the car while Humphrey went to fill the automobile with gas. No rape or robbery had occurred at this time. When Humphrey returned, the victim was again forced into the car in the back seat with Wilson while Humphrey drove along the Ohio River finally crossing into Indiana near Hebron. During this drive, the victim was robbed and raped as well as killed. The restraint of the victim was not incidental to the commission of robbery or rape.

 The second argument by Wilson is that the rape and robbery convictions at the guilt phase cannot be used to prove aggravating circumstances for murder and kidnapping at the penalty phase. The rationale used in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) is applicable here. K.R.S. 532.025 does not require that the defendant be pun-ished for the same offense twice. The statute only requires that the aggravating circumstances be used only to determine whether the crime of murder should receive the death penalty. If the aggravating circumstance cannot be proved, then the penalty of death cannot be imposed. K.R.S. 532.030(2).

Simply because the aggravating circumstance duplicates one of the underlying offenses does not mean that the defendant is being punished twice for the same offense. The underlying offenses were only factors to be considered as to whether the punishment for murder should be death. Wilson was not subjected to double jeopardy or multiple punishment for the same offense.

## XX

 Wilson argues that he was denied due process of law because the prosecution used the same facts to prove two separate aggravating circumstances, murder committed during the commission of a robbery and murder committed for profit.

The aggravating circumstance of robbery relates to the taking of the victim's property in the course of committing theft. K.R.S. 515.020(1). The murder for profit aggravating circumstance goes beyond the time when her property was physically taken from her in the course of committing a theft. The credit cards of the victim were used the day after her death when Wilson and Humphrey purchased a number of items for themselves with the cards. Clearly, they obtained something of monetary value which profited them. Use of the credit cards is not the same act as the robbery of the victim. The two aggravating circumstances are not the same as to either time or place. The jury properly found the existence of two distinct aggravating factors.

 In any event, the aggravating circumstances of first-degree robbery and first-degree rape are sufficient to sustain the death sentence. *Simmons v. Commonwealth,* Ky., 746 S.W.2d 393 (1988); *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

## XXI

The death sentence imposed on Wilson was not inappropriate, arbitrary, discriminatory, unusual or disproportionate. The sentence was not fixed because he was black or because he chose to limit his standby counsel's participation in his defense. The sentences were imposed because he was found guilty as charged.

Pursuant to K.R.S. 532.075, we have made a careful review of the record and have determined that the death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor. The death sentence was not excessive or disproportionate to the penalty imposed in similar sentences since 1970 considering both the crime and the defendant. Those cases have been previously recited by this Court most recently in *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988) and that list is incorporated herein by reference, and our review in this case is in accordance with K.R.S. 532.075(5). In addition, we have also considered the case of *Moore v. Commonwealth*, Ky., 771 S.W.2d 34 (1989); *Epperson and Hodge v. Commonwealth*, Ky., 809 S.W.2d 835 (1991), and *Taylor v. Commonwealth*, Ky., 821 S.W.2d 72 (1991). We have conducted an independent review of all the circumstances and conclude that they exceed any minimum threshold justifying capital punishment.

## XXII

The capital penalty phase instructions properly guided and channeled the jury's discretion.

## XXIII

Wilson's complaint about format of the capital sentencing verdict forms is without merit. A review of the verdict forms and the potential interpretation the jurors gave them involves consideration of the instructions they were given. The inquiry we make involves what a "reasonable juror" would understand the charge to mean. *Frances v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The specific instructions given to the jury regarding aggravating circumstance were clear. The Wilson jury was properly instructed that the finding of an aggravating circumstance did not require imposition of the death penalty. *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672 (1985).

## XXIV

Wilson's final argument about cumulative error is misplaced. In view of the fact that we did not determine any specific reversible error, we do not find any cumulative error. *Cf. McDonald v. Commonwealth*, Ky., 554 S.W.2d 84 (1977) and *Michigan v. Tucker*, 417 U.S. 433 at 446, 94 S.Ct. 2357 at 2365, 41 L.Ed.2d 182 (1974). He received a fair trial.

The judgment of conviction is affirmed. This matter is remanded as to the imposition of sentence in regard to the kidnapping charge.

STEPHENS, C.J., and LAMBERT, REYNOLDS, SPAIN and WINTERSHEIMER, JJ., concur.

LEIBSON, J., files a separate opinion dissenting in part, in which COMBS, J., joins.

LEIBSON, Justice, dissenting in part.

Respectfully, I dissent from so much of the holding as affirms Wilson's conviction for conspiracy.

KRS 506.110 embodies the general rule that one cannot be convicted of both a conspiracy to commit a crime and the actual crime. The underlying theory of this rule propounds that the conspiracy, being an act of preparation, merges into the completed offense. The lesser offense of conspiracy becomes a part of the larger criminal act.

The statute bars double conviction in the situation where *all* of the criminal objectives of the conspiracy have been consummated and received convictions. Thus, where a conspiratorial agreement contains multiple criminal objectives, KRS 506.110(2) permits a conviction for the substantive crime and for the conspiracy if some of its objectives have not reached a conviction

for a substantive crime. In this situation the whole conspiratorial agreement has not completely merged into convictions for the substantive criminal acts. The conspiracy, comprised of multiple objectives, remains separate and larger than the one criminal conviction.

For instance, suppose Smith & Wesson conspire to commit four robberies, but the police apprehend them after the third robbery. The defendants can be convicted of the three robberies and the conspiracy to make four robberies. If we weren't allowed to convict of the conspiracy in this situation, then the act of agreeing to make a fourth robbery would go unpunished. However, if Smith & Wesson had successfully committed all four robberies before their arrest, we could only legitimately convict them of the four robberies and could not add on a conspiracy conviction. The conspiracy has completely merged into the commission of the four robberies. No act of preparation remains unpunished. The general rule that bars double conviction would apply in this scenario.

In the present case, assuming arguendo that the Commonwealth proved a conspiracy existed containing as multiple objectives both kidnapping and robbery, KRS 506.-110(2) does not permit a conviction of both kidnapping and robbery AND the conspiracy to kidnap and rob. All of the criminal objectives of the conspiracy have merged into the convictions for the substantive crimes. The general rule barring the double conviction should apply. Every act of preparation has merged into the commission of the crime and received a conviction. Nothing is left to punish.

All of this is explained in the Model Penal Code and Commentaries, drafted by the American Law Institute, which was the source of the Kentucky Penal Code, KRS 506.110.

COMBS, J., joins this dissent.