RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GREGORY WILSON,

　　　　　*Petitioner-Appellant,*

　　　*v.*

PHIL PARKER, Warden,

　　　　　*Respondent-Appellee.*

No. 05-5191

>

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 99-00078—David L. Bunning, District Judge.

Argued: September 11, 2007

Decided and Filed: January 29, 2008

Before: BOGGS, Chief Judge; and GIBBONS and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Bruce P. Hackett, OFFICE OF JEFFERSON DISTRICT PUBLIC DEFENDER, Louisville, Kentucky, for Appellant. David A. Smith, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Bruce P. Hackett, Daniel T. Goyette, Leo G. Smith, OFFICE OF JEFFERSON DISTRICT PUBLIC DEFENDER, Louisville, Kentucky, for Appellant. David A. Smith, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

---

## OPINION

---

　　BOGGS, Chief Judge. Gregory Wilson appeals a district court order denying his petition for a writ of habeas corpus. Wilson raised twenty-four claims in his petition, the district court granted him a certificate of appealability as to eight claims, and this court later expanded the certificate to include a portion of one other claim. In brief, the claims before this court are: invalid waiver of Wilson's right to counsel, ineffective assistance of trial counsel, *Brady* violations, failure to grant Wilson a separate trial from his co-defendant, due process violation due to admission of hair-matching evidence, ineffective assistance of appellate counsel, denial of a state-court forum in which to raise the ineffective assistance of appellate counsel claim, and failure to disclose information relating to an affair between Wilson's co-defendant and a judge (not the trial judge) of the state court in which his trial was conducted. In expanding the certificate of appealability, we also agreed to hear Wilson's claim that his state trial judge should have recused himself, to the

1

extent that claim relates to Wilson's claim that his state trial was prejudiced because of an alleged affair between his co-defendant and a different judge.

After reviewing all of Wilson's claims, we hold that none of them meets the standard required for a grant of the writ. Accordingly, we affirm the district court's denial of the writ.

## I

### A. Factual History

The Kentucky Supreme Court summarized the facts of the case as follows:

The victim was a restaurant employee in Newport. On Friday, May 29, 1987[,] at 11:45 p.m., she left her best friend's house and said she was going straight home. The prosecution presented evidence that she had just parked her car outside of her apartment in Covington when she was abducted by Wilson and co-defendant Humphrey at knife point.

Testimony at trial from various sources, including Humphrey, indicated that the victim was forced into the back seat of her own car. Humphrey drove the car to the flood wall in Covington. Wilson took the victim out of the car and took her up on the flood wall and made her lie down with her eyes closed while Humphrey went to put gas in the car. After Humphrey returned from the gas station, Wilson again forced the victim into the back seat of the car.

Wilson made the victim unbutton her blouse. Wilson finished undressing the victim and raped her. He then tied her hands with a lamp cord, and the victim began begging for her life. Wilson told her she would have to die. Humphrey said, "You have seen us. You know who we are, and you have to die." The victim kept begging, "Please don't kill me. I don't want to die." Wilson robbed her and strangled her to death before they crossed the state line into Indiana.

Wilson and Humphrey disposed of the victim's naked corpse in a wooded thicket in rural Hendrix [sic] County, Indiana. Later that same morning, Saturday, May 30, Wilson and Humphrey stopped at a Holiday Inn in Crawfordsville, Indiana. According to a registration card, Humphrey and a guest checked into the hotel at 4:19 a.m. Two of the maids there identified the pair as Wilson and Humphrey.

Wilson and Humphrey proceeded to a Payless Shoe Store in Danville, Illinois where the victim's credit card was used to purchase two pairs of women's shoes and some hosiery. Later that same day, May 30, 1987, Wilson and Humphrey went to a K-Mart in Danville where the victim's credit card was used to make purchases totalling $227.46. Included in these purchases were a man's Seiko watch and a woman's Gruen watch for $68.00 each. Wilson and Humphrey also paid cash for a number of cosmetic items and some clothing. Later that day, the victim's credit card was used to make a $24.50 purchase at an Amoco gas station in Urbana-Champaign, Illinois.

On Sunday, May 31, Wilson and Humphrey returned to the home of Humphrey's best friend, Beverly Finkenstead. Finkenstead testified that Humphrey had a K-Mart bag with a blouse in it. They both had a watch on and were each wearing a necklace. On Sunday, June 7, Humphrey visited Finkenstead and told her details of the crimes in which she and Wilson had participated the previous weekend. Eight days later, on June 15, Finkenstead reported to the police what Humphrey had told her. Also on

June 15, the Hendrix [sic] County, Indiana Sheriff's Department was summoned to a wooded thicket where a corpse had been discovered.

Authorities were able to determine the identity of the corpse only by comparing its remaining teeth with the victim's dental X-rays. The cause of death could not be determined due to the absence of internal organs. A forensic entomologist testified that, based on the extent of blowfly maggot development in and on the corpse, the estimated time of death had occurred 15 to 19 days prior to his June 16 examination of the corpse.

Wilson told cell mate Willis Maloney details of the crimes including that the initial intent had been to "snatch" the victim and rob her; that the victim was still alive when her money was taken from her; that the victim was killed before they crossed the state line into Indiana; that the corpse would be so badly decomposed that no sperm would show up; and that they had used the victim's credit card to purchase, among other things, a watch Wilson was wearing at the time of his arrest which Humphrey later obtained by signing it out from one of the jailers. Wilson also told Maloney, "I bet they can't find what I used to strangle her with."

Maloney's and Humphrey's account of the rape was corroborated by the presence of semen on the back seat of the victim's car. Head hairs similar to those belonging to Humphrey were found inside the victim's car. Pubic and head hairs similar to those belonging to Wilson were also found inside the victim's car. A handwriting expert established that Humphrey had authored the forged credit card receipts. A search of the hotel room where Wilson and Humphrey were arrested produced various items of clothing, all bearing K-Mart price tags.

Humphrey was the only defense witness during the guilt/innocence phase of the trial. Wilson gave his own closing argument in which he told the jury he was not guilty, he "never met nor knew the victim" and that Humphrey told her sister that she killed the victim. The jury returned guilty verdicts against both defendants. After the penalty phase, Wilson was sentenced to death for kidnapping and murder. He was sentenced to consecutive prison terms of 20, 20 and 10 years respectively for first-degree rape, first-degree robbery and criminal conspiracy to commit robbery.

*Wilson v. Commonwealth*, 836 S.W.2d 872, 876-77 (Ky. 1992), *cert. denied*, 507 U.S. 1034 (1993).

## B. Procedural History

The Kentucky Supreme Court affirmed Wilson's convictions and sentences for murder, rape, robbery, and conspiracy, but set aside the jury's death sentence for kidnaping and remanded the case for resentencing on that charge. *Id.* at 890-91, *overruled by St. Clair v. Roark*, 10 S.W.3d 482, 498 (Ky. 1999) (overruling *Wilson*'s holding that a double jeopardy violation occurs in convicting a defendant of both the murder and the capital kidnaping of the same victim and imposing separate death sentences for each conviction). In January 1995, the trial court imposed a sentence of life imprisonment for kidnaping. Wilson appealed, and the Kentucky Supreme Court reversed the sentence and remanded with the requirement that Wilson be resentenced by a jury unless the trial court imposed the minimum sentence. In March 1996, the trial court sentenced Wilson to twenty years of imprisonment for kidnaping. The Kentucky Supreme Court affirmed the sentence in January 1997.

While Wilson's appeal was pending, the Governor of Kentucky signed a warrant requiring that Wilson be executed on February 1, 1996. The Kentucky Supreme Court granted a motion to stay the execution for sixty days to allow Wilson to file a post-conviction motion pursuant to

Kentucky Rule of Criminal Procedure 11.42. *See Bowling v. Commonwealth*, 926 S.W.2d 667 (Ky. 1996). In his Rule 11.42 hearing, Wilson alleged, among other things, that he did not knowingly and voluntarily waive his right to counsel and that he received ineffective assistance of trial and appellate counsel. The trial court held a nine-day evidentiary hearing in September and October 1996 and denied the motion in March 1997. The Kentucky Supreme Court affirmed that decision in May 1998. *See Wilson v. Commonwealth*, 975 S.W.2d 901 (Ky. 1998). The United States Supreme Court denied certiorari in March 1999. *See Wilson v. Kentucky*, 526 U.S. 1023 (1999). On April 14, 1999, the Governor of Kentucky signed a warrant requiring that Wilson be executed on May 14, 1999.

On May 10, 1999, the United States district court granted Wilson a stay of execution and ordered that his habeas corpus petition be filed within thirty days. Wilson filed his federal habeas petition on June 7, 1999. He raised twenty-three claims in his petition and added a twenty-fourth in a later pleading. The district court granted Wilson's motion for an evidentiary hearing on his twenty-first claim, alleging ineffective assistance of appellate counsel, and held the hearing in August 2001. The district court also permitted Wilson to file transcripts of co-defendant Humphrey's post-conviction proceedings from 2002 and 2003. In a roughly 150-page opinion, the district court denied Wilson's petition for habeas relief and issued a certificate of appealability for eight of his claims. We expanded the certificate to include Wilson's claim that his state trial judge should have recused himself, but only to the extent that claim relates to Wilson's separate claim that his state trial was prejudiced because of an alleged affair between his co-defendant and a different judge.

As summarized by the district court, the following claims are now before us: Wilson did not knowingly, intelligently, and voluntarily waive the right to counsel (Claim Two); the performance of Wilson's attorney denied Wilson the right to effective assistance of trial counsel (Claim Three); the prosecution's failure to disclose exculpatory and other relevant evidence violated *Brady* (Claim Nine); Wilson's rights were violated by failure to grant him a separate trial from the co-defendant (Claim Fourteen); Wilson's rights to a fair trial and due process were violated by the admission of hair-matching evidence (Claim Sixteen); Wilson was denied effective assistance of counsel on the direct appeal of his convictions to the Kentucky Supreme Court (Claim Twenty-One); Wilson's rights were violated because he was denied a state-court forum in which to raise a claim that he received ineffective assistance of appellate counsel (Claim Twenty-Two); Wilson was denied a fair trial, due process of law, the right to present a defense, and the right to cross-examine and confront witnesses against him when information relating to an alleged relationship between his co-defendant and another trial judge in the court in which his trial was conducted was not disclosed to him (Claim Twenty-Four); and, to the extent it involved this last claim, Wilson's rights to a fair trial and due process were violated by the trial judge's failure to recuse himself (Claim Five).

## II

Wilson filed his habeas corpus petition in June 1999, well after the 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214; therefore, the provisions of that Act apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Frazier v. Huffman*, 343 F.3d 780, 787 (6th Cir. 2003), *opinion altered on denial of reh'g*, 348 F.3d 174 (2003), *cert. denied*, 541 U.S. 1095 (2004). Under AEDPA, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004). Furthermore, if the state court decided a claim, a writ of habeas corpus must be denied unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1)-(2).

Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Bugh v. Mitchell*, 329 F.3d 496, 501 (6th Cir. 2003). "'[C]learly established Federal law, as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Williams v. Bagley*, 380 F.3d 932, 942 (6th Cir. 2004) (quoting *Williams*, 529 U.S. at 412).

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08; *Bugh*, 329 F.3d at 501. Relief is also available under this clause if the state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context. *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 540 U.S. 1004 (2003). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003), *cert. denied*, 543 U.S. 1080 (2005).

We review *de novo* a district court's legal conclusions denying habeas relief. *See Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004). We review the district court's factual findings for clear error. *See Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).

## III

### A. Invalid Waiver of Right to Counsel (Claim Two)

Wilson argues that he did not voluntarily waive his right to counsel and elect to proceed pro se because the trial court effectively forced him to choose between representing himself or being represented by allegedly unprepared and incompetent counsel. Wilson maintains that he repeatedly told the trial court that he did not want to represent himself and did not know how to do so and repeatedly expressed his dissatisfaction with the attorneys who had volunteered to represent him. After briefly recounting the convoluted history of Wilson's relationship with his counsel, we turn to the relevant federal law, as determined by the Supreme Court, and conclude that Wilson's claim fails.

### 1. Pre-Trial and Trial Proceedings

Wilson's defense team changed several times during the pre-trial period. In July 1987, the state trial court appointed two attorneys to represent Wilson, Clyde Richardson and Steve Megerle. In October 1987, Wilson filed a motion to act as co-counsel, invoking his "right to participate fully in his own defense including acting as counsel." (citing *Faretta v. California*, 422 U.S. 806 (1975)). Around that time, Megerle withdrew, and the court appointed Kevin McNally from the Kentucky Department of Public Advocacy (KDPA) in November 1987. In February 1988, McNally secured a continuance, shifting the trial date from March to September of that year. In May 1988, McNally requested permission to withdraw from the case, stating that he had already tendered his resignation from the KDPA in January 1988, had been pushing back his termination date because of Wilson's case, and was exhausted. Richardson remained as counsel, but had told the judge that he was simply not able to lead a capital defense. At this point, Judge Lape, the state trial judge, posted a notice outside his courtroom seeking volunteer counsel to represent Wilson. Sharon Sullivan responded to the notice and volunteered to act as a research assistant. Around the same time, John Foote volunteered to work on the case doing "leg work," but not to act as lead attorney, and William Hagedorn volunteered and was appointed as lead counsel.

Almost immediately, issues arose between McNally and Hagedorn. Once McNally had withdrawn and Hagedorn had volunteered to take on Wilson's case, the two attorneys met in early June 1988. After that meeting, McNally apparently developed some concerns about Hagedorn's ability to handle Wilson's case. McNally refused to turn over Wilson's case file to Hagedorn without explicit permission from Wilson. McNally's colleagues at the KDPA undertook an investigation of Hagedorn's qualifications and past conduct in other cases. McNally shared the information gathered with Wilson and told Wilson not to authorize the transfer of files until Judge Lape had been apprised of the information regarding Hagedorn. On June 17, 1988, Wilson filed a "Motion for Justice and Fairness" expressing his dissatisfaction with Hagedorn and Richardson and requesting that Judge Lape dismiss all volunteer and appointed counsel and appoint lawyers "experienced in handling 'Capital Death Penalty' cases." Judge Lape granted Richardson's motion to withdraw on July 6, 1988. In response to McNally's continued visits and communication with Wilson, Judge Lape ordered that such visits stop. Around this same time, Hagedorn visited Wilson in jail, but could not convince him to turn over the case file.

In response to Wilson's motion to disqualify Hagedorn and Foote, Judge Lape held a hearing on August 16, 1988. According to Judge Lape, the purpose of the hearing was to "put on qualifications – as to what qualifications a party should have to handle a case such as this." Mario Conte, Chief Trial Attorney for the Federal Public Defenders Office in San Diego, California, appeared to argue the motion on Wilson's behalf. Wilson, Brenda Humphrey, Humphrey's counsel, and Hagedorn were also present. Hagedorn objected vehemently to the hearing, stating that Conte was jeopardizing Wilson's case and that the court had no authority to conduct such a hearing. Conte began to outline the role of the capital defense attorney and then proposed to discuss Hagedorn's "unethical behavior regarding stolen property" and "regarding a malpractice suit." Judge Lape stated that he was not going to hear any evidence regarding Hagedorn's background and would not "do anything in the form of character assassination . . . ." Judge Lape then terminated the hearing. No further inquiry or review into the qualifications of Hagedorn and Foote was undertaken.

At the beginning of trial on September 2, 1988, a series of colloquies took place in chambers between Wilson, Judge Lape, Hagedorn, and Commonwealth Attorney Donald Buring, the prosecutor. During these colloquies, Wilson gave conflicting statements about whether he wanted to continue pro se. Wilson reiterated his belief that his appointed attorneys were incompetent to represent him, that he had no confidence in his attorneys' ability to represent him, and that Hagedorn and Foote did not speak for him. Judge Lape then informed Wilson, "If you wish to represent yourself, under the Constitutional Amendments you have indicated to me, sir, you certainly have that right, and I will certainly let you do that." "I do," replied Wilson. *Ibid.* However, Wilson then stated, "And I don't want to proceed pro se. I can't 'cause I don't know how to proceed pro se." The colloquy continued as follows:

> JUDGE LAPE: That's right, you don't. So based upon that statement then, Mr. Hagedorn and Mr. Foote then will continue because you say that you cannot pro se.
>
> DEFENDANT WILSON: So you're saying you're forcing Mr. Hagedorn and Mr. Foote upon me then as counsel.
>
> JUDGE LAPE: I am appointing, sir, Mr. Hagedorn and Mr. Foote to represent you, sir.
>
> DEFENDANT WILSON: I oppose Mr. Hagedorn and Mr. Foote.
>
> JUDGE LAPE: I know you do. That's certainly evident.
>
> DEFENDANT WILSON: They're not competent.

\*\*\*

JUDGE LAPE: Well, I don't how you can say it any other way. You have said that. Now these men are going to represent you. There is no other counsel to represent you. You don't have counsel to represent you, so that you are now represented by them, and your motion is overruled.

MR. HAGEDORN: Your Honor, I would like to add something to that motion.

JUDGE LAPE: Certainly.

MR. HAGEDORN: As much of the motion that says that Mr. Wilson wants to try this case himself, but says he's not qualified to try the case himself, I think that the Court should allow him to try it himself and I will sit there and advise him. I do not intend to speak for Mr. Wilson.

JUDGE LAPE: Well, I have --

DEFENDANT WILSON: I'm speaking for myself.

JUDGE LAPE: – reviewed the case of Faretta v. California, and under it he has his constitutional right to represent himself, and if he tells me though that he's incompetent to do so, then I have to be concerned about that. Everyone has the right to represent themselves. . . .

\* \* \*

MR. HAGEDORN: Judge, I think he should try the case himself.

JUDGE LAPE: Well, I can't let him sit out there and say nothing. I'm going to –

\* \* \*

DEFENDANT WILSON: Okay. I oppose my counsel.

JUDGE LAPE: You oppose your counsel.

DEFENDANT WILSON: They don't represent me.

JUDGE LAPE: They don't represent you. All right, sir, then you represent yourself. Mr. Hagedorn and Mr. Foote, you will stay with him out there in the event that he needs some help. Other than that, Mr. Wilson represents himself.

After a brief recess, Judge Lape confirmed with Wilson that he intended to proceed pro se. Wilson replied, "Yeah. Like I said, I will proceed pro se, only to do so in the absence of competent, ethical, experienced, capital defense attorneys." Judge Lape, borrowing from Sixth Circuit instructions to United States district courts on obtaining valid waivers of the right to counsel,[1] then explained to Wilson all of the hazards of proceeding pro se and concluded that Wilson was acting consciously and voluntarily. The rest of the trial proceeded with Wilson occasionally directing Hagedorn to conduct cross-examination of prosecution witnesses. Brenda Humphrey testified in her own defense, and she was the only defense witness called. Wilson made his own closing statement, and

---

[1]*See United States v. McDowell*, 814 F.2d 245 (6th Cir. 1987).

Hagedorn made a statement for the record out of the presence of the jury. Hagedorn also made statements to the jury during the penalty phase of the trial.

### 2. Waiver of the Right to Counsel

Wilson claims that his waiver of the right to counsel was invalid because he was forced to choose between continuing pro se or continuing with allegedly incompetent counsel.

A criminal defendant has the right to represent himself without counsel, provided that he knowingly and intelligently forgoes the benefits of having counsel assist him. *See Faretta v. California*, 422 U.S. 806, 835 (1975). A defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Ibid.* (quoting *Adams v. United States* ex rel. *McCann*, 317 U.S. 269, 279 (1942)); *see also Johnson v. Zerbst*, 304 U.S. 458, 468 (1938) (stating that waiver of counsel must be "competently and intelligently" made). The Supreme Court has provided guidelines for courts to consider when accepting a waiver of counsel:

> To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

*Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948) (quoted in *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir. 2001)). The extent to which a court must probe into these elements will vary from case to case, but "the court's obligation to maintain the integrity of the Sixth Amendment remains constant." *Fowler*, 253 F.3d at 249. "The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer." *Carnley v. Cochran*, 369 U.S. 506, 516 (1962). Accordingly, a trial court's outright failure to explain the risks and dangers in proceeding pro se or a failure to adequately examine the waiver will justify issuing a writ of habeas corpus. *See James v. Brigano*, 470 F.3d 635, 643-44 (6th Cir. 2006); *Fowler*, 253 F.3d at 249-50.

In the instant case, the Kentucky Supreme Court held that Wilson knowingly and voluntarily waived his right to counsel. *See Wilson*, 836 S.W.2d at 880-81. The court recounted the extent to which Judge Lape warned Wilson of the hazards of proceeding pro se, concluding "the trial judge zealously made Wilson aware of the dangers of the path he had chosen." *Id*. at 883. The Kentucky Supreme Court held that it:

> believe[d] that a fair reading of the record as a whole clearly indicates that Wilson understood the dangers and disadvantages of self-representation. He knew he was entitled to counsel, yet the record clearly establishes that he elected to proceed with his eyes wide open. Wilson's course of conduct during the trial . . . put the trial judge between a rock and a hard place. We believe that the trial judge's decision to allow Wilson to proceed with standby counsel was under the circumstances fair and reasonable.

*Id.* at 884. The state post-conviction hearings and the federal district court habeas proceedings also held that Wilson had knowingly and intelligently waived his counsel and that no further pre-trial inquiry into his appointed counsel's competence was constitutionally required.

The Kentucky Supreme Court's reasoning is neither contrary to, nor an unreasonable application of, Supreme Court precedent. Judge Lape's repeated colloquies with the defendant adequately probed Wilson's understanding of the consequences of the waiver. Judge Lape

confirmed with Wilson that he intended to proceed pro se. Wilson replied, "Yeah. Like I said, I will proceed pro se, only to do so in the absence of competent, ethical, experienced, capital defense attorneys." Judge Lape modeled his colloquy with Wilson on the standards for obtaining a waiver that we have set for United States district courts. *See United States v. McDowell*, 814 F.2d 245 (6th Cir. 1987). Exercising our supervisory powers over federal courts in this circuit, we introduced those standards to ensure that federal criminal defendants' waivers of counsel were knowing, voluntary, and intelligent. *See id*. at 248-50.

Although there is no evidence that Wilson was acting to delay his trial, we have previously held that it is not an unreasonable application of *Faretta* to find a waiver of counsel where a defendant with a history of switching attorneys knew of his right to counsel, knew the charges and potential penalties, and rejected appointed counsel while asserting he did not want to represent himself. *See King v. Bobby*, 433 F.3d 483, 492-93 (6th Cir. 2006). Even when a defendant "did not straightforwardly assert his right to self-representation, and even told the trial court twice that he did not wish to represent himself," we held that "by rejecting all of his options except self-representation," the defendant validly waives his right to counsel in state court. *Id.* at 492.

Wilson's arguments that the trial court should have conducted further inquiry into his appointed counsels' competence and that their alleged incompetence invalidated his waiver of the right to counsel are unpersuasive. In response to Wilson's claims, the Kentucky Supreme Court stated that it had not found any cases granting authority to a trial court to "allow an indigent defendant to put his appointed counsel on trial for alleged past transgressions." *Wilson*, 836 S.W.2d at 880. Relying on Sixth Circuit case law, the Kentucky Supreme Court stated: "In order to warrant a substitution of counsel during trial, a defendant must show good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict which leads to an apparently unjust verdict, and demonstrate prejudice by the attorney's performance." *Ibid.* (citing *Wilson v. Mintzes*, 733 F.2d 424 (6th Cir. 1984)). The Kentucky Supreme Court applied those standards to Wilson's conflict with Hagedorn (which had been ongoing during the pre-trial period and came to a head the day before trial was set to begin) and held that Wilson's case did not require substitution of counsel.

We agree. Indigent defendants do not have the right to counsel of their choice. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989); *Morris v. Slappy*, 461 U.S. 1, 14 (1983). In the present case, Judge Lape held a special hearing on Wilson's motion for new counsel. At that hearing, Mario Conte outlined the role of the capital defense attorney. Judge Lape suspended the hearing when Conte began to address Hagedorn's alleged incompetence. Since no Supreme Court precedent compelled such a hearing, Judge Lape's decision to suspend it was not error. Although we have held, in reviewing a federal conviction, that a federal trial court has a duty to determine the reasons for an indigent defendant's dissatisfaction with current counsel when he requests that appointed counsel be discharged and new counsel appointed, *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990), because *Iles* is not "clearly established federal law, as determined by the Supreme Court of the United States," it cannot provide a basis for granting habeas relief under AEDPA. 28 U.S.C. § 2254(d)(1); *see James*, 470 F.3d at 643.

## B. Ineffective Assistance of Trial Counsel (Claim Three)

Since Wilson waived his right to counsel, his claim of ineffective assistance of trial counsel necessarily fails. By exercising his constitutional right to present his own defense, a defendant necessarily waives his constitutional right to be represented by counsel. *See Faretta*, 422 U.S. at 834. Logically, a defendant cannot waive his right to counsel and then complain about the quality of his own defense. *Id*. at 834 n.46; *Gall v. Parker*, 231 F.3d 265, 320 (6th Cir. 2000).

Despite Wilson's waiver, the Kentucky Supreme Court addressed his ineffective assistance claim and held that Wilson had not met the standards for a grant of habeas relief established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Wilson*, 836 S.W.2d at 878-80. The court found that Wilson hampered counsels' efforts to assist him by, for example, not allowing counsel to make an opening statement or closing argument during the guilt phase and not testifying or calling any defense witnesses to testify. The court held that, to the extent Wilson permitted Hagedorn to participate, Hagedorn performed effectively. *Id.* at 879. "Wilson has failed to demonstrate in any way that he was prejudiced by Hagedorn's performance. Considering all the evidence of guilt, we fail to see how the verdict would have been any different had Wilson been supplied with the best criminal defense attorney in the nation." *Id.* at 880.

We find no basis for overturning the Kentucky Supreme Court's holding. Hagedorn and Foote served as standby counsel, available if Wilson requested help. To the extent Hagedorn and Foote failed to act during trial, Wilson merely suffered the consequences of his decision to proceed pro se. Given this fact, we cannot say that the Kentucky Supreme Court's analysis was contrary to, or an unreasonable application of, *Strickland*.

In fact, the record refutes one of Wilson's most serious charges of ineffective assistance. Wilson asserts that Hagedorn and Foote refused his request that they cross-examine Willis Maloney, a key prosecution witness who testified that Wilson, while they were both incarcerated, had confessed the murder, rape, and kidnaping. On direct appeal, the Kentucky Supreme Court found that "Wilson chose not to cross-examine Maloney." *Wilson*, 836 S.W.2d at 885. Wilson has the burden of rebutting, by clear and convincing evidence, the presumption that this factual finding is correct. *See* 28 U.S.C. § 2254(e)(1). A review of the trial transcript supports the state court's finding and fails to support Wilson's claim. Humphrey's attorney cross-examined Maloney, after which the trial court asked Wilson whether he wanted to cross-examine the witness. Wilson renewed his objection to being represented by Hagedorn and Foote and replied that he did not know how to cross-examine. When the trial court asked Wilson if he wanted Hagedorn or Foote to cross-examine Maloney, Wilson replied, "If the Court wishes to." The trial court told Wilson it was Wilson's decision, not the court's. Wilson stated, "It is not my decision either." Thus, when offered the opportunity, Wilson declined to cross-examine Maloney and did not ask for Hagedorn or Foote to cross-examine Maloney.

Wilson also argues that Hagedorn had a conflict of interest because Hagedorn allegedly represented Maloney. Appellant's Br. at 26, 44. The facts of this claim, however, are not clear. In his state post-conviction proceedings, Wilson submitted an affidavit from Maloney as evidence of Hagedorn's incompetence. Maloney averred that Hagedorn had represented him in a criminal matter in Campbell County, Kentucky, and that Hagedorn's representation had been "totally incompetent." Maloney's affidavit did not indicate the charges or the date of the proceedings during which Hagedorn allegedly represented him. However, in response to Wilson's request for impeaching information about Maloney, the prosecution informed Wilson that Maloney had been jailed in Campbell County on charges of theft in February 1988. Thus, there is circumstantial evidence in the record for the proposition that Hagedorn represented Maloney earlier in 1988 on charges of theft in Campbell County. The results of that representation (other than Maloney's insistence that Hagedorn performed badly) are unknown. Wilson cites *United States v. Cronic* for the proposition that prejudice will be presumed if defense counsel suffers an actual conflict of interest. *See* 466 U.S. 648, 662 n.31 (1984).

However, even assuming that Hagedorn was Maloney's attorney earlier in 1988 (and not during some other previous time when Maloney was incarcerated), Wilson has not demonstrated that Hagedorn "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980)). Morever, unfortunately for Wilson, even if we were to

presume prejudice due to an actual conflict of interest, Hagedorn was not Wilson's attorney when the time came to cross-examine Maloney since Wilson had elected to proceed pro se. As discussed above, Wilson forbade Hagedorn from cross-examining Maloney and chose not to cross-examine Maloney himself. Therefore, the decision not to cross-examine cannot be attributed to any alleged conflict of interest. Thus, we agree with the district court's ultimate holding that, given Wilson's waiver, the alleged conflict here does not provide a basis for granting habeas under AEDPA.

The question of whether Wilson may nevertheless assert ineffective assistance of counsel arising from Hagedorn's actions before Wilson elected to proceed pro se is closer. At oral argument, Wilson's counsel suggested that Hagedorn's failure to conduct any mitigation investigation during the time when he was still Wilson's counsel is sufficient to sustain an ineffective assistance of counsel claim. This argument apparently was not raised before the state courts, and the Kentucky Supreme Court's application of *Strickland* only addressed Hagedorn's conduct after Wilson's waiver. *See Wilson*, 836 S.W.2d at 877-79. Because this conduct occurred pre-waiver, the logic above that exercising the *Faretta* right to represent oneself necessarily eliminates claims of ineffective assistance does not apply. However, because we hold that the failure to begin a mitigation investigation before Wilson's waiver was not prejudicial, we do not alter our conclusion above that Wilson's claim of ineffective assistance fails.

Under *Strickland*, a successful ineffective assistance of counsel claim must demonstrate both the objective unreasonableness of defense counsel's conduct and its prejudicial effect. *See Strickland*, 466 U.S. at 687-88. It could be objectively unreasonable, under some circumstances, for defense counsel to fail to investigate and prepare mitigating evidence for the penalty phase of a capital trial. *See Wiggins v. Smith*, 539 U.S. 510, 523-29 (2003) (finding that counsels' decision to cease investigating after receiving the pre-sentencing report fell short of prevailing professional standards). It is also correct, as the Kentucky Supreme Court noted, that reviewing courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Wilson*, 836 S.W2d at 878; *see Rompilla v. Beard*, 545 U.S. 374, 385 (2005) (stating that courts should make "every effort to view the facts as a defense lawyer would have done at the time"). Thus, applying the first prong of *Strickland* requires looking at defense counsel's conduct at the time of its occurrence (or when it should have occurred in the case of omissions). All else being equal, the failure to begin a mitigation investigation until a week before a capital trial could be a basis for claiming deficient conduct by defense counsel. *See Wiggins*, 539 U.S. at 523-29; *Williams*, 529 U.S. at 395-96.

The second prong of *Strickland* requires demonstration of prejudice. In particular, "[t]o establish prejudice [the defendant] 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Williams*, 529 U.S. at 391 (quoting *Strickland*, 466 U.S. at 694). In this case, Wilson's decision to proceed pro se substantially affects our analysis of whether Hagedorn's pre-waiver conduct was prejudicial. As noted above, Wilson waived his right to counsel on the first day of trial and thereafter controlled his defense, including deciding whether he or Hagedorn would cross-examine witnesses and make opening or closing statements to the jury. Even assuming Hagedorn's pre-waiver conduct was deficient, the fact of the waiver makes it virtually impossible to assess whether such conduct was prejudicial. Although there may be cases in which the facts indicate that pre-waiver defense conduct sufficiently prejudiced the defendant to sustain an ineffective assistance claim, this is not such a case.

In this case, Wilson had indicated throughout the pre-trial period that he did not want Hagedorn and Foote to represent him. On September 2, 1988, before the trial began, Wilson confirmed during his colloquy with Judge Lape that he intended to proceed pro se. Thus, Wilson elected to proceed pro se and preempted any of Hagedorn's efforts well before any penalty phase

would begin (assuming Wilson were found guilty). Judge Lape appointed Hagedorn and Foote to act as standby counsel, but Wilson clearly exercised control over the conduct of his trial. During the actual penalty phase, Wilson made a statement to the jury denying his guilt. The failure to present mitigation evidence cannot be attributed to Hagedorn. Finally, the evidence of Wilson's role in raping and killing the victim was overwhelming, including testimony from Maloney and Humphrey. This evidence leads us to conclude that Wilson cannot demonstrate prejudice from Hagedorn's pre-waiver conduct. Therefore, Wilson's claim of ineffective assistance based on pre-waiver conduct also fails.

**C.  Failure to Disclose Relationship Between Humphrey and Judge Gilliece (Claims Five and Twenty-Four)**

In claim five of his habeas petition, Wilson alleged that he was denied a fair trial because the trial judge, Judge Lape, refused to recuse himself. In claim twenty-four, Wilson alleged that he was deprived of his constitutional rights at trial because a sexual relationship between his co-defendant, Brenda Humphrey, and another state trial court judge, Judge Gilliece, was not disclosed to him. The district court granted a certificate of appealability on claim twenty-four, and we granted Wilson's application for a certificate on claim five, but only to the extent it involves claim twenty-four. Because the Humphrey-Gilliece relationship was undisclosed until well after Wilson's state court proceedings had concluded, the Kentucky courts did not assess the merits of that claim. Accordingly, the federal habeas court may review the claim de novo. *See Lyell v. Renico*, 470 F.3d 1177, 1181-82 (6th Cir. 2006); *McAdoo*, 365 F.3d at 498. We hold that Wilson's claim has no merit.

Wilson filed a pre-trial motion on July 29, 1988, for Judge Lape to recuse himself on grounds having nothing to do with the Humphrey-Gilliece relationship. The trial court forwarded the motion to the Chief Justice of the Kentucky Supreme Court for consideration. *See* Ky. Rev. Stat. § 26A.020(1). The Chief Justice denied the motion. After the trial, on direct appeal, Wilson raised the issue again. In addition to his original arguments, Wilson argued that Judge Lape exhibited bias and hostility toward him by allegedly calling him bad names, noting that Wilson did not trust any lawyer, expressing a belief that Wilson was engaging in obstructionist tactics, and speaking to Wilson in an angry tone of voice before the jury. *See Wilson*, 836 S.W.2d at 885. The Kentucky Supreme Court found that Wilson had failed to support his allegations with citations to the record and that the record as a whole did not support Wilson's claim. *Id.* at 885-86. The court concluded that "entire record indicates that the trial court treated Wilson with respect . . . ." *Id.* at 886.

At the time of Wilson's trial, Judge Gilliece was also a Kenton County Circuit Judge. Judge Gilliece's relationship with Brenda Humphrey came to light in 2001, after Wilson had exhausted his state court remedies and filed his petition for a federal writ of habeas corpus. In May 2001, after she had exhausted her direct appeals and state post-conviction relief, Brenda Humphrey sought a new hearing on the fairness of her trial because of her relationship with Judge Gilliece. Her motion for a hearing was granted, and evidence was admitted. In July 2002, during Brenda Humphrey's state post-conviction evidentiary hearing, testimony regarding her relationship with Judge Gilliece was introduced. Wilson attempted to intervene in that hearing, but the state trial court denied that motion. The Kentucky Supreme Court affirmed the denial. *See Humphrey v. Commonwealth*, No. 2003-SC-0671-TG, 2005 WL 924188, at *3 (Ky. Apr. 21, 2005). The district court permitted Wilson to supplement the federal habeas record with transcripts, exhibits, and the trial court's findings of fact and conclusions of law from Humphrey's post-conviction hearing.

At her July 2002 hearing, Humphrey testified that she first met Judge Gilliece in 1985, when he performed a marriage ceremony for Humphrey and her third husband. Judge Gilliece later contacted Humphrey, who had previously been arrested for prostitution, and they began a sexual relationship. Humphrey estimated that she saw Judge Gilliece at least once a week from 1985 to 1987. She called Judge Gilliece after her arrest for the crimes she committed with Wilson, and he

expressed support for her, but did not see her until he learned her case had been assigned to Judge Lape. Humphrey continued to see Gilliece during her trial. According to Humphrey, Judge Gilliece believed in her innocence and told her not to worry about the charges against her. She testified that no plea deal was ever offered and that Judge Gilliece did not intervene on her behalf. Humphrey and Wilson were tried together, and Humphrey was also convicted and sentenced to life in prison without the possibility of parole for twenty-five years for capital kidnaping, and a total of fifty years in prison for facilitation of murder, first-degree robbery, facilitation of first-degree rape, and criminal conspiracy. *See Humphrey v. Commonwealth*, 836 S.W.2d 865, 867 (Ky. 1992).

Donald Buring, the prosecutor who tried the case against Wilson and Humphrey, also testified at Humphrey's evidentiary hearing. He stated that the jail staff brought him a letter that Judge Gilliece sent to Humphrey after her arrest but before her indictment. According to Buring, he could not recall the contents of the letter beyond recalling that it generally stated that "things will work out." Buring thought the correspondence unusual, but it did not lead him to suspect an intimate relationship between Humphrey and Judge Gilliece. Buring testified that he did not pursue the matter once the case was assigned to Judge Lape and that the relationship had no effect on the case. Buring did not discuss any possible relationship with Judge Gilliece, Judge Lape, or Humphrey's counsel. Buring sought the death penalty against Humphrey and did not engage in any plea negotiations with her.

Because the state courts had not adjudicated Wilson's claim, the district court analyzed the claim under 28 U.S.C. § 2254(e)(2) to determine if an evidentiary hearing was required. The district court properly found that Wilson was excused for not developing the factual record in state court since the Humphrey-Gilliece relationship only came to light after Wilson had exhausted his state remedies. The district court analyzed Wilson's claim that the failure to disclose the relationship between Judge Gilliece and Humphrey denied him a fair trial under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The court found that, although the evidence of the Humphrey-Gilliece relationship was clearly not available to Wilson during his trial, there was no basis for determining that the outcome of the trial would have been different if the relationship between Humphrey and Gilliece had been disclosed at the time of the trial because it was not relevant to Wilson's case. In particular, the district court noted that there was no evidence that Judge Gilliece approached Judge Lape or the prosecutor on Humphrey's behalf. The district court concluded that the alleged facts underlying Wilson's claim were not sufficient to establish by clear and convincing evidence that, but for the alleged constitutional error, no reasonable finder of fact could have found him guilty.

We granted Wilson a certificate of appealability for his claim that Judge Lape should have recused himself, but only as that claim relates to the possible impact of the relationship between Humphrey and Gilliece. We assess claims of judicial bias against state court judges under the standard announced by the Supreme Court in *Liteky v. United States*, 510 U.S. 540 (1994), a case involving statutory recusal standards for federal judges. *See Lyell v. Renico*, 470 F.3d 1177, 1186 (6th Cir. 2006). In *Liteky*, the Supreme Court held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." 510 U.S. at 555. To show improper prejudice, a judge's comments must "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Ibid.*

Wilson's claim fails under *Liteky* because he has not identified any comment or action by Judge Lape that demonstrates the degree of antagonism necessary for him to succeed in a claim of judicial bias. Moreover, there was no evidence from Humphrey's hearing or elsewhere that Judge Lape was influenced by, or even knew of, the relationship between Humphrey and Gilliece. There is nothing in the state trial record indicating that Judge Lape favored Humphrey or disfavored Wilson. Thus, Wilson's claim that Judge Lape should have recused himself fails.

Regarding the Humphrey-Gilliece relationship, *Brady* requires that the prosecution disclose evidence that may impeach the credibility of a witness. *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972). The evidence must be turned over if it is both favorable to the accused and material to guilt or punishment. *See United States v. Jones*, 399 F.3d 640, 647 (6th Cir.), *cert. denied*, 126 S.Ct. 148 (2005). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the case would have been different. *See Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *Zuern v. Tate*, 336 F.3d 478, 484 (6th Cir. 2003). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

In this case, even though Buring knew that Gilliece and Humphrey were corresponding, Wilson's claim fails under *Brady* because there is not a reasonable probability that, had the evidence been disclosed to him, the outcome of the case would have been different. *See Zuern*, 336 F.3d at 484. Humphrey was not the only witness to testify against Wilson. Much of the prosecution's case derived from his confession to his cell-mate Maloney and circumstantial evidence linking him to the crime. Wilson's proposed impeachment of Humphrey, even if allowed under the rules of evidence, would not have detracted from this proof. Wilson argues that he could have used evidence of the Humphrey-Gilliece affair to impeach Humphrey. Appellant Br. at 96-107. However, evidence of the Humphrey-Gilliece affair would likely not have been proper grounds to impeach Humphrey. There is no proof Gilliece intervened on Humphrey's behalf or that Humphrey used the relationship to win favorable treatment from the prosecutor or Judge Lape. Therefore, the Humphrey-Gilliece relationship was irrelevant to any bias Humphrey may have had in her testimony that Wilson had been the one who killed the victim. While cross-examination to reveal possible biases is a protected right, *see Davis v. Alaska*, 415 U.S. 308, 316 (1974), raising irrelevant theories of bias is not. Trial courts retain discretion to impose limits on cross-examination based on concerns about harassment, prejudice, confusion of issues, "or interrogation that is repetitive or only marginally relevant." *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000); *see Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Moreover, the impact of undisclosed evidence on Wilson's trial preparations is irrelevant to materiality under *Brady*; only the effect on the trial's outcome matters. *See United States v. Presser*, 844 F.2d 1275, 1282 (6th Cir. 1988) (discussing *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976)). Wilson had ample opportunity and motive to cross-examine Humphrey without knowing about the affair. Humphrey was facing the death penalty and attempted to minimize her role in the crimes by shifting blame for the murder to Wilson. Given the opportunity to cross-examine Humphrey, Wilson declined. Finally, we note that, to the extent it is relevant to a credibility determination, Humphrey admitted on direct examination that she had been a prostitute.

Thus, Wilson's claims stemming from the Humphrey-Gilliece relationship fail. For similar reasons, the district court did not err in denying Wilson an evidentiary hearing regarding the Humphrey-Gilliece relationship. Wilson cannot be held to the stringent standards of 28 U.S.C. § 2254(e)(2), because the Humphrey-Gilliece relationship came to light well after Wilson's state post-conviction proceedings had concluded. *See Williams v. Taylor*, 529 U.S. 420, 434-35 (2000). However "the fact that a petitioner is not disqualified from receiving an evidentiary hearing under § 2254(e)(2) does not entitle him to one." *Ivory v. Jackson*, 509 F.3d 284 (6th Cir. 2007). In this case, Wilson is not entitled to an evidentiary hearing because, as discussed above, he has not alleged sufficient grounds for release.

## D. *Brady* Violations (Claim Nine)

Wilson alleges that the prosecution failed to disclose evidence concerning Maloney, the jailhouse informant who testified against Wilson at trial. Wilson moved to declare Maloney an indispensable witness, meaning that Maloney would have to submit to an interview with defense counsel, and Wilson argues that the prosecution's objections to those motions denied him his right to develop impeaching evidence about Maloney. Wilson also claims that the prosecution should

have turned over potentially exculpatory evidence gathered by the FBI. We hold that these claims are meritless.

Wilson raised his claim that the prosecution failed to disclose evidence about Maloney on direct appeal. The Kentucky Supreme Court noted that Wilson had requested a long list of information to attack Maloney's credibility, including:

> all correctional institution files of the witness; any organizations to which Maloney had ever belonged; any information Maloney may have provided to any governmental authority in any jurisdiction in any case; any prior instances of Maloney ever lying or exaggerating; any inmates the Commonwealth may have interviewed at the jail to determine whether they spoke with Wilson; and every case in which the Commonwealth used informants.

*Wilson*, 836 S.W.2d at 885. The Kentucky Supreme Court held that Wilson's request was "clearly excessive," that the prosecutor had followed Kentucky disclosure law, and that Wilson had failed to show how the information could have affected the outcome of his case. *Ibid*. (citing *Agurs*, 427 U.S. at 97. The district court concluded that the Kentucky Supreme Court's decision was neither contrary to nor an unreasonable application of Supreme Court precedent under *Brady*.

We agree and affirm. A *Brady* violation occurs when the evidence at issue is favorable to the accused, the evidence was suppressed by the State, and prejudice resulted. *See Strickland v. Greene*, 527 U.S. 263, 281-82 (1999). The Kentucky Supreme Court's analysis comported with Supreme Court precedent. The prosecutor provided the criminal charges that were pending against Maloney, the prosecutor's communications with the Ohio prosecutor's office concerning Maloney, the fact that Maloney was on federal parole, Maloney's disclosures to the prosecutor, and the fact that Maloney provided Wilson with money and cigarettes while they were incarcerated. At trial, the prosecutor established in direct examination that Maloney was a convicted felon and reviewed the criminal charges pending against Maloney in Kentucky and Ohio. The prosecutor also inquired as to whether Maloney had received any favorable treatment in return for his testimony. In light of the information the prosecutor disclosed and the conduct of the trial, we hold that Wilson has not shown a reasonable probability that the his trial was prejudiced because the prosecutor did not comply with the entirety of Wilson's exceptionally broad discovery request.

Wilson raised the second part of his claim, that the prosecution should have turned over exculpatory information gathered by the FBI, in his state post-conviction action. The trial court denied the petition, and the Kentucky Supreme Court affirmed the decision without mentioning the FBI claim. The district court determined that Wilson knew or should have known about the FBI's involvement in the case because FBI agents testified at trial. The court found that Wilson had procedurally defaulted this portion of his claim because he did not raise it on direct appeal, that he could no longer bring the claim in state court under Kentucky res judicata principles, and that he could not meet the "cause and prejudice" standard to excuse his default. The district court also concluded that Wilson was not entitled to an evidentiary hearing.

We agree and affirm. Regarding the FBI information, Wilson procedurally defaulted because he failed to present the grounds of his claim to the state courts. *See* 28 U.S.C. § 2254(b); *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996). Unless Wilson can show cause to excuse his default and actual prejudice to his case at trial or on appeal, he may obtain habeas review only in the extraordinary case that he can show a fundamental miscarriage of justice has occurred, for example, by showing a constitutional violation has resulted in conviction of one who is actually innocent. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986). Wilson failed to raise his claim on direct appeal and is barred under Kentucky Rule of Criminal Procedure 11.42 from raising it in post-conviction proceedings. In addition, a three-year statute of

limitations bars Wilson from raising the claim. *See* Ky. Rule Crim. P. 11.42(10). The time limit applies here, and Wilson does not qualify for any of the statutory exceptions. Although ineffective assistance of appellate counsel may constitute cause for procedural default, *see Murray*, 477 U.S. at 492, the ineffective assistance claim itself can be procedurally defaulted, *see Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). Here, Wilson never raised his claim of ineffective assistance of appellate counsel in state court. He raised the claim in his federal habeas petition but did not include it as grounds for his appellate counsel's failure to raise the *Brady* claim. Accordingly, Wilson's claim is barred.

## E.  Denial of Separate Trials (Claim Fourteen)

Wilson alleges that the trial court denied him a fair trial and due process rights by failing to grant him a separate trial from his co-defendant Brenda Humphrey. He argues that their defenses were antagonistic, that there was a stark difference between Humphrey's allegedly vigorous defense and his allegedly deficient defense, and that Humphrey's statements to prosecution witnesses were unduly prejudicial to him. He also argues that evidence of Humphrey's purchases using the victim's credit card was admissible against her but unduly prejudicial as to him.

The Kentucky Supreme Court held on direct appeal that, under Kentucky law, a defendant is not entitled to severance unless he shows prior to trial that joinder would be prejudicial. *See Wilson*, 836 S.W.2d at 886-87. A Kentucky court will not "reverse a conviction for failure to grant separate trials unless it is clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge as to make his failure to grant severance an abuse of discretion." *Id*. at 887. Accordingly, a "defendant must show that antagonism prevented a jury from being able to separate and treat distinctively evidence that is relevant to each particular defendant at trial and that the antagonism between codefendants will mislead or confuse the jury." *Ibid.* The court noted that Wilson and Humphrey had both admitted their crimes to others, and that the evidence presented against Wilson during the guilt phase was largely the same as the evidence against Humphrey. *Ibid.* The court also observed that Humphrey's presence at trial may have reminded the jurors that Wilson was not solely responsible for the crime. *Ibid.*

We agree with the district court that the Kentucky Supreme Court decision is neither contrary to nor an unreasonable application of United States Supreme Court precedent. The Supreme Court has recognized that states have significant interests in conducting joint trials. *See Buchanan v. Kentucky*, 483 U.S. 402, 417-19 (1987). The Supreme Court has also held that "an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Since much of the damaging testimony introduced at trial would have been admissible even if Wilson had been tried alone, he cannot meet that standard. Moreover, Wilson declined to cross-examine Humphrey to minimize the impact of her testimony blaming him for the murder. We hold that the Kentucky Supreme Court's analysis comported with Supreme Court precedent and affirm the district court.

## F.  Admission of Hair-Matching Evidence (Claim Sixteen)

At trial, an expert witness testified that hairs found in the victim's car were similar to samples of Wilson's head and pubic hairs. Wilson argues that the state court's admission of hair-matching evidence constitutes constitutional error because the evidence was unduly prejudicial because of its unreliability and the danger that the jury would erroneously give it more weight than it deserved. Appellant's Br. at 135. Wilson sought to compel DNA testing of the hairs that were found in the victim's car, and the district court granted that motion. However, the Commonwealth could not find the hairs, and no DNA testing occurred. Wilson raised the claim on direct appeal, and

the Kentucky Supreme Court found that Wilson's argument went to the weight of the evidence, not its admissibility, and concluded that the testimony was properly introduced. *See Wilson*, 836 S.W.2d at 890. The district court held that no Supreme Court precedent showed a constitutional violation based on use of hair-matching evidence and Wilson was not entitled to an evidentiary hearing, especially in light of the other evidence of guilt.

We affirm. A federal court cannot issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). More specifically, a trial judge's decision concerning the admission of evidence is a state law matter generally not subject to habeas review. *See Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."). Wilson has not shown that the admission of the expert testimony denied him a fair trial. The witness testified that head hairs similar to Wilson's were found on the back of the passenger side front seat of the victim's car. He also stated that pubic hairs similar to hair from Wilson were found in the area of the passenger front seat, on the floorboard of the front seat, and in the hatch-back area behind the rear seat. Hagedorn cross-examined the witness on Wilson's behalf, and the witness conceded that the hairs could have come from somebody else. Absent Supreme Court precedent showing a constitutional violation based on the use of hair-matching evidence, we hold that Wilson has not demonstrated that the admission of the evidence denied him a fair trial. *Cf. Buie v. McAdory*, 341 F.3d 623, 624-25 (7th Cir. 2003) (holding that no constitutional error resulted from an expert's testimony that "within a reasonable degree of scientific certainty" hair-matching evidence inculpated the defendant and noting that the Constitution guarantees only the right to test evidence and does not guarantee that experts "must be *right*"). Even if the hair-matching evidence is unreliable as Wilson alleges and was excluded, the outcome of the trial would have been unaffected.

## G. Ineffective Assistance of Appellate Counsel (Claims Twenty-One and Twenty-Two)

Wilson alleges that he received ineffective assistance of counsel on direct appeal because his appellate attorneys had a conflict of interest that prevented them from scrutinizing the actions of his KDPA trial attorneys and other attorneys who were not counsel of record. Appellant's Br. at 68-70. He also complains that, because his direct appeal counsel raised the issue of his trial counsels' ineffectiveness, the law of the case doctrine barred him from raising that claim in his state post-conviction motion to vacate. Appellant's Br. at 64-66. In a related claim, Wilson alleges that he had no state-court forum in which to raise a claim of ineffective assistance of appellate counsel. Appellant's Br. at 70-71. We affirm the district court's denial of these claims.

These claims were first raised in the district court, which held an evidentiary hearing. Gail Robinson is an attorney who worked for KDPA for many years and is married to Kevin McNally, who was Wilson's counsel of record until he withdrew and Hagedorn was appointed. At the evidentiary hearing, she testified that, although she was not Wilson's counsel of record on direct appeal, she wrote a majority of Wilson's appellate brief. Robinson stated that, in retrospect, it was a mistake for her to have raised the ineffective assistance of trial counsel claim on direct appeal because it operated to bar Wilson from raising the claim "in a better and more full manner in a later [state post-conviction] proceeding." Ira Mickenberg also testified at the evidentiary hearing. After reviewing the case file and opinions, Mickenberg stated that it could never be effective assistance of appellate counsel to raise an ineffective assistance of trial counsel claim on direct appeal in Kentucky. Mickenberg stated that it was always necessary to develop facts outside the trial record in an ineffective assistance of trial counsel claim.

Mickenberg also stated that Wilson's appellate counsel should have raised Hagedorn's alleged conflict of interest arising from Hagedorn's prior representation of Maloney, the prosecution's main witness. Mickenberg also testified that Wilson's appellate counsel should have

raised McNally's interference with the trial as grounds for appeal. Thus, Wilson argues that his appellate counsel failed to raise specific issues on appeal.

To prevail on a claim of ineffective assistance of counsel, petitioner must show both that his counsel's performance was deficient and that the deficiency resulted in prejudice. *See Strickland*, 466 U.S. at 687. The district court's findings of fact are reviewed for clear error. *Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000). The performance and prejudice components of *Strickland* present mixed questions of law and fact and are reviewed *de novo*. *Strickland*, 466 U.S. at 698. As noted above, counsel's conduct is deficient if it falls below an objective standard of reasonableness. To evaluate a claim of ineffective assistance of appellate counsel, we assess the strength of the claim appellate counsel failed to raise. "Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). "If there is a reasonable probability that [the defendant] would have prevailed on appeal had the claim been raised, we can then consider whether the claim's merit was so compelling that appellate counsel's failure to raise it amounted to ineffective assistance of appellate counsel." *Id.* at 700.

The district court properly denied Wilson's claim of ineffective assistance of appellate counsel. As the district court noted, Wilson's claim that his appellate counsel failed to raise meritorious issues must fail. The failure to raise issues regarding Hagedorn's alleged incompetence (absences, failure to cross-examine witnesses, etc.) cannot constitute ineffective assistance of appellate counsel because, as discussed previously, *see supra* Part III.A-B, these issues would not have changed the outcome. As discussed above, the state courts found, and we agree, that Wilson elected to proceed pro se. Therefore, any claims regarding deficient trial counsel performance are without merit, including claims alleging conflict of interest because of Hagedorn's prior representation of Maloney on theft charges. Wilson's decision to proceed pro se also means that Wilson could not later claim that his decision to follow McNally's advice after McNally ceased to be counsel of record constitutes a ground for appeal.

Wilson's claim about Robinson's decision to include the ineffective assistance of trial counsel in his direct appeal also fails. As the district court noted, Wilson repeatedly questioned his trial counsel's performance during the trial. Having made their performance an issue, Wilson might have been prevented from raising the issue in post-conviction proceedings if he had not raised it on direct appeal. *See Gross v. Commonwealth*, 648 S.W.2d 853, 857 (Ky. 1983) (holding "that the proper procedure for a defendant aggrieved by a judgment in a criminal case is to directly appeal that judgment, stating every ground of error which it is reasonable to expect that he or his counsel is aware of when the appeal is taken"). Moreover, Robinson's decision to raise the claim on direct appeal did not prejudice Wilson because the claim would not have been successful if raised in an 11.42 post-conviction motion. As discussed above, Wilson's ineffective assistance of trial counsel claim would have failed because he had chosen to proceed pro se.

Wilson's claim that Robinson was conflicted because her husband, McNally, had represented Wilson before Hagedorn's appointment also fails. Logically, Wilson cannot show ineffective assistance by Robinson because she did not represent him. The attorneys of record in Wilson's direct appeal were David Bruck, Mario Conte, and Robert Carran. *See Wilson*, 836 S.W.2d at 876. Even assuming arguendo that Robinson represented Wilson (in so far as the attorneys of record outsourced the work of writing Wilson's brief to Robinson), we agree with the district court that Wilson has not shown that the alleged conflict rendered Robinson's performance objectively unreasonable. The district court found no factual basis for concluding that the alleged conflict affected Robinson's work as ghost writer on the brief, and we agree. Indeed, since Wilson had proceeded pro se, Wilson's appellate counsel likely did not raise the issue of McNally's alleged interference with Hagedorn because there was no attorney-client relationship between Wilson, on the one hand, and Hagedorn and Foote, on the other, with which McNally could have interfered.

Although Wilson did not argue the point, we also hold that the decision of Bruck, Conte, and Carran to outsource the brief-writing work to Robinson was not deficient. Robinson was an experienced capital defender, and the decision to let her write the brief clearly meets the objective standard of reasonableness required under *Strickland*.

In a separate claim, Wilson argues that he was denied a constitutional right to a state-court forum in which to bring his claim of ineffective assistance of appellate counsel. We agree with the district court's dismissal of this claim. The United States Supreme Court held that if a dismissal of an appeal by right occurs because of the ineffectiveness of appellate counsel, the defendant is entitled to a reinstatement of his appeal. *See Evitts v. Lucy*, 469 U.S. 387 (1985). However, while such ineffective assistance of appellate counsel is a constitutional violation, the Supreme Court has not required the states to provide a forum to litigate such a claim. Rather, in *Evitts*, the Court remanded with a direction to allow the appeal to proceed. *Evitts* ensures that a defendant is not denied a hearing of his appeal of right due to ineffective assistance; it does not state that defendants have a constitutional right to pursue ineffective assistance of appellate counsel claims in other circumstances.

In Kentucky, a claimant is barred from asserting ineffective assistance of appellate counsel in an 11.42 post-conviction motion and should instead seek to reopen the original appeal. *See Hicks v. Commonwealth*, 825 S.W.2d 280 (Ky. 1992); *Commonwealth v. Wine*, 694 S.W.2d 689, 694-95 (Ky. 1985). Thus, when an appeal is dismissed or defaulted due to ineffective assistance of appellate counsel, a defendant may move to reinstate the appeal in the original court of appeal. *See, e.g.*, *Wine*, 694 S.W.2d at 695. But where, as in the instant case, the appeal has already been heard by the proper court, the case will not be reexamined by the appellate court, and the ineffective assistance claim may not be reviewed under an 11.42 motion. *Hicks*, 825 S.W.2d at 281. *Evitts* does not compel a different result. Since no other Supreme Court precedent has expanded the *Evitts* rule to require a forum for ineffective assistance of appellate counsel claims when the appellant's case was actually heard and decided, Wilson's claim must fail.

## IV

Therefore, for the reasons set out above, we AFFIRM the district court's denial of the writ of habeas corpus.